**WORTHINGTON FOODS, INC., Plaintiff,**

v.

**KELLOGG COMPANY, Defendant.**

No. C–2–89–0842.

United States District Court,
S.D. Ohio, E.D.

March 1, 1990.

Edwin M. Baranowski and Kathleen Mc-Manus, Trafford, Porter, Wright, Morris & Arthur, Columbus, Ohio, for plaintiff.

Mary Jane McFadden and Melodee S. Kornacker, Casey, McFadden & Winner, Dublin, Ohio, and Daniel Mason and Bruce Wecker, Furth, Fahrner, Bluemle & Mason, San Francisco, Cal., for defendant.

## OPINION AND ORDER

KINNEARY, District Judge.

This matter comes before the Court to consider the motion of the plaintiff, Worthington Foods, Inc. ("Worthington") for a preliminary injunction, to enjoin the defendant, Kellogg Company ("Kellogg"), from selling its "Heartwise" cereal. Fed.R. Civ.P. 65. The plaintiff alleges that Kellogg's use of the name "Heartwise" is a violation of the trademark, service mark, and certification mark that Worthington Foods purportedly has in the "HEART-WISE" name and logo borne on its products.

In the Complaint, Worthington asserts a claim for relief under the Ohio common law of trademark infringement, unfair competition, and dilution, as well as section 43(a) of the Lanham Trade–Mark Act, 15 U.S.C. § 1125(a) (1982), *amended by* 15 U.S.C.A. § 1125(a) (West Supp.1989). In a memorandum supporting the instant motion, the plaintiff also asserts that it is entitled to relief under the Ohio Deceptive Trade Practices Act, Ohio Rev.Code Ann. §§ 4165.01–4165.04 (Anderson 1980 & Supp.1989).

## I. CONCLUSIONS OF FACT

The parties presented evidence at a hearing before the Court which began on October 18, 1989. Considering the evidence presented at the hearing and the memoranda submitted after the hearing, the Court reaches the following conclusions of fact. The Court will first discuss Worthington Foods, Inc. and its HEARTWISE mark. Then, the Court will describe Kellogg Company and the development of its Heartwise mark.

### A. *Worthington Foods, Inc.*

The plaintiff, Worthington Foods, Inc., has sold health food for fifty years and is the world leader in vegetable protein products.[1] The company intends to provide consumers with an alternative to meat products which have certain "unhealthy characteristics."[2] In fact, a growing number of consumers are paying closer attention to diet. "Worthington Foods serves a growing market whose consumers are concerned about their health and are taking greater interest in their dietary choices."[3] According to the plaintiff:

- 42 percent of U.S. households have at least one member who is on a diet to control cholesterol.

- 68 percent of shoppers are switching to foods lower in fat and calories, and 71 percent are looking for foods higher in fiber.

- The number of vegetarians in the United States has increased six-fold over the past decade to more than 6 million.

---

1. Transcript at I–16 (testimony of Dale Twomley).

2. *Id.*

3. Plaintiff's exhibit 1 at 1.

· And by 1995, total sales of "healthy foods" are expected to exceed $98 billion annually ... or about *one-third* of all food purchases.[4]

Worthington's president estimates that sales of its products will reach $65 million this year.[5]

Worthington produces three lines of products. First, it sells food under the brand name of "Worthington" which it has sold since 1939. Second, the company's most widely distributed line of goods is its "Morningstar Farms" set of products. Third, Worthington produces a smaller line of goods, named "Natural Touch." [6]

The Morningstar Farms line consists of five products distributed nationwide. The Scramblers product is a substitute for eggs.[7] Breakfast Links and Breakfast Patties are vegetable protein foods which look and taste like sausage links and sausage patties respectively. Breakfast Strips are substitutes for bacon. Finally, Grillers are analogous to hamburger patties.[8] Collectively, the vegetable protein substitutes for meat products are called "meat analogs."

The Morningstar Farms line also includes three other products sold under the name of Country Breakfasts, which Worthington distributes to selected markets.[9] Each Country Breakfast is a combination of items. One contains French toast and two protein patties.[10] Another contains hash browns, two protein links, and scrambled egg product.[11] The last type of Country Breakfast contains two pancakes, two protein links, and scrambled egg product.[12]

In selected markets, Worthington also sells certain chicken analog products within the Morningstar Farms line under the name of Country Crisps.[13] One product is a substitute for battered deep fried chicken patties.[14] The other Country Crisps products look to be chicken nuggets, one with a "zesty" flavor and the other with a "home style" flavor.[15]

Displayed on all packages of the products in the Morningstar Farms line is the logo that is the subject matter of this suit.[16] It consists of a yellow circle with a red heart inside. The words "Zero Cholesterol" appear inside the circle, but outside the heart; they traverse the area just inside of the circumference of the circle. Inside the heart, the word "HEARTWISE" appears. The "HEART" part of the word rests just inside the left edge of the heart. "WISE" rests just above the right edge of the heart. Given the ninety-degree angle formed by the left and right edges of the heart, the segments "HEART" and "WISE" also are at a right angle to each other.[17]

On the Morningstar Farms items distributed nationally, Breakfast Strips, Breakfast Patties, Grillers, and Breakfast Links, the circular logo is 3.5 cm in diameter and the heart inside is 2 cm wide at its largest point.[18] On the Country Breakfasts, the

---

**4.** *Id.* at 2. "Millions of Americans who have only recently heard of the white, waxy substance circulating through their bloodstreams are now looking for 'Heart–Wise' alternatives to the high-cholesterol, high saturated fat foods that far too long have been part of their diets." *Id.* at 6.

**5.** Transcript at I–16 (testimony of Dale Twomley).

**6.** *Id.*

**7.** Plaintiff's exhibit 1 at 6.

**8.** *See* Transcript at I–19 (testimony of Dale Twomley); *see generally id.* at I–17 (naming the products).

**9.** *See generally id.* at I–17 (naming the products).

**10.** Plaintiff's exhibit 5.

**11.** Plaintiff's exhibit 6.

**12.** Plaintiff's exhibit 12.

**13.** Transcript at I–17 (testimony of Dale Twomley).

**14.** *Id.* at I–19 to –20.

**15.** *Id.* at I–20; Plaintiff's exhibits 9, 11.

**16.** The Scramblers egg substitute, however, does not bear the HEARTWISE mark.

**17.** *See, e.g.,* Appendix A (facsimile of Breakfast Strips package).

**18.** Plaintiff's exhibits 3, 4, 8, 10.

circular logo is approximately 2.5 cm in diameter and the heart is approximately 1.4 cm wide.[19] Logos of this smaller size appear on the Country Crisp products as well.[20]

Worthington developed the HEARTWISE mark with the assistance of an advertising agent late in 1986.[21] The plaintiff did not intend to create a logo and name to reflect the manufacturer's name, the name of the line of products, or the name of the product itself. For foods bearing the HEARTWISE mark, the name of the line of foods is Morningstar Farms and each individual product has a name such as Grillers or Breakfast Strips.

Instead, Worthington sought to produce a mark which would distinguish the products even more than the Morningstar Farms name does. Specifically, Worthington wished to establish something analogous to the "Good Housekeeping Seal of Approval," which would seem to certify the healthy nature of its products.[22] Worthington narrowed the field of potential names and finally began using the HEARTWISE mark in February 1987.[23] It has continued to use it from that time until the present.

The plaintiff markets its products through brokers. These brokers solicit purchase orders from retail chains. Upon delivery, the chains stock these items in their warehouses. They then distribute the goods among their retail stores as they see fit.[24] The retail stores stock the Morningstar Farms items in frozen food chests or freezer cases. These containers appear in the frozen foods section of the grocery stores.

Worthington's has spent $3.4 million on advertising since 1987.[25] Worthington has advertised in national magazines such as *U.S. News and World Report, Newsweek, Prevention,* and *Reader's Digest.*[26] It also places advertisements in newspapers.[27] Moreover, its advertisements appear in special advertisement tabloids distributed by grocery stores.[28] It also sends out direct mailings to consumers.[29]

Advertising materials used in the grocery store include an "angler," which is a plastic card hanging over the price rail of a freezer case to draw attention to the product.[30] Also, Worthington uses "neck hangers" on Puritan Oil bottles. A neck hanger is a cardboard card which rests on top of an oil bottle; the neck of the bottle fits through a hole in the card.[31] Furthermore, Worthington provides stores with stickers bearing the HEARTWISE mark and design for use on freezer case glass doors.[32] Finally, Worthington hands out coupons in stores,[33] and places them on cartons of certain Morningstar Farms products[34] as well as on products of other companies.

Worthington also pays its brokers a fee for their marketing services and has spent $3.4 million in such fees since 1987.[35] In addition, Worthington makes certain price concessions in the form of discounts for grocery stores ("trade deals"). It has spent $7 million on such concessions since 1987.[36] Fees for brokers are approximately four percent of sales and trade deals amount to about eight percent of sales.[37]

---

19. Plaintiff's exhibits 5, 6, 12.

20. Plaintiff's exhibits 7, 11.

22. *Id.*

23. *Id.*

24. *See id.* at I–69.

25. *Id.* at I–152 (testimony of William Kirkwood).

26. *Id.* at I–71 (testimony of Franklin Poston).

27. *Id.* at I–85 to –87.

28. *Id.* at I–84.

29. *Id.* at I–70 to –71.

30. *Id.* at I–73.

31. *Id.* at I–74.

32. *Id.*

33. *Id.* at I–74 to –75.

34. *See* Plaintiff's exhibit 39.

36. *Id.* at I–153.

37. *Id.*

Given that sales in 1990 will be approximately $66 million and $75 million next year,[38] fees for brokers and trade deals will amount to $7.92 million in 1990 and $9 million in 1991.

In the future, Worthington plans to increase production, having embarked upon a capital improvements project.[39] Moreover, the plaintiff contends that it signed a letter of intent to acquire a company that manufactures food very similar to Worthington's; this company makes ready-to-eat cereal in the form of breakfast "biscuits," which it calls "Ruskets."[40]

### B. Kellogg Company

Kellogg Company's U.S. Food Product Division produces ready-to-eat cereal for the American market.[41] Consumers normally eat ready-to-eat cereal simply by pouring the cereal out of the box into a bowl and drenching it in milk.[42] Kellogg's executive vice president for marketing and sales in the U.S. Food Products Division, William Weintraub, estimated that 93% of American households stock ready-to-eat cereal and Kellogg products are in 84% of households.[43]

Kellogg produces a large number of different cereals, appealing to different segments of the ready-to-eat cereal market. Many people are concerned with limiting the amount of cholesterol they ingest. Appealing to this market, Kellogg produced a cereal named "Heartwise." The cereal package contains a discussion of a finding of the Henry Ford Hospital Heart and Vascular Institute that a diet low in fat and high in soluble fiber can lower cholesterol levels. Kellogg markets two kinds of Heartwise cereal, one with prunes added and one without.

Displayed on all packages of Heartwise cereal is the other mark which is the subject of this suit. The word "Heartwise" appears in a 15.2 cm by 6.6 cm rectangle on the front of each cereal box; it extends approximately 13 cm and the letter "H" is 2.7 cm high. Appearing directly next to the final "e" in "Heartwise" is a small "TM." Above the rectangle containing "Heartwise" is the "house mark" of the Kellogg Company: the word "Kellogg's" written in script which is a facsimile of the signature of the company's founder, W.K. Kellogg. The word "Heartwise" also appears on both sides of the box underneath the "Kellogg's" house mark. Kellogg also placed the word on the top and bottom of each cereal box. Prominently displayed here as well is the "Kellogg's" house mark.[44]

Kellogg began developing the formula for Heartwise cereal in January 1985.[45] The cereal contains a grain called psyllium which is high in soluble fiber; soluble fiber is the ingredient in the cereal which may help to reduce cholesterol.[46] Kellogg considered between seventy-five and one hundred names before deciding to use the "Heartwise" mark.[47] Kellogg uses the mark to convey the message to consumers that the cereal "can be part of a diet that is ... wise ... for your heart."[48]

Kellogg consulted a number of trade name directories and computerized data bases to determine if other companies were making significant usage of the trademark "Heartwise." Such searches did not reveal Worthington's use of the mark.[49] Kellogg

---

**38.** Id. at I–151.

**39.** Id. at I–154 to –155.

**40.** Ruskets, made from whole wheat, are in the form of "biscuits," which the consumer can place in a bowl and immerse in milk. Each biscuit looks to be a mass of what otherwise might be loose flakes pressed into a cake and cut into uniform pieces. A serving consists of two "biscuits" with a half cup of milk. See Plaintiff's exhibit 29.

**41.** Transcript at II–15 (testimony of William Weintraub).

**42.** Id. at II–17.

**43.** Id. at II–19.

**44.** See Appendix B (facsimile of Heartwise cereal box).

**45.** Transcript at II–40 (testimony of William Weintraub).

**46.** Id. at II–37.

**47.** Id. at II–68.

**48.** Id. at II–37.

**49.** Plaintiff's exhibit 2B at 1.

knew that Worthington had sought a federal trademark for "HEARTWISE" and the heart-shaped design Worthington now uses, but that the U.S. Patent and Trademark Office had labelled the application as "abandoned." [50] Kellogg, however, was unaware of the existence of the Morningstar Farms line and its use of the HEARTWISE mark in spite of the abandoned application. [51] Given Kellogg's conclusion that no registered trademark existed in "Heartwise" and that no company was making significant use of it, the defendant chose Heartwise as the name of its cereal. It claims that it did not intend to use the name in order to take advantage of Worthington's goodwill in the name. [52]

Kellogg markets its cereal products by employing a direct sales force which attempts to solicit purchase orders directly from retail chains. [53] Of course, once the retail chains receive the goods in their warehouses, they ship the product to the stores at the time and place which they may choose. [54] When the cereal reaches the retail stores, the store employees place it in the ready-to-eat cereal aisle among other such cereals. [55] Indeed, Heartwise, like other Kellogg products, is likely to appear on the cereal aisle next to other Kellogg ready-to-eat cereals. [56]

Kellogg's advertising budget is considerable. The amount allocated for late 1989 was approximately $18,064,000. [57] In 1990, Kellogg plans to spend $34,100,000. [58] A portion of its advertising consists of television commercials; the defendant's budget for television ads shown in late 1989 was seven or seven and one-half million dollars. [59] Kellogg also plans to place magazine advertisements. [60] Finally, the defendant places coupons in Sunday newspapers. [61]

## II. THE STANDARD FOR PRELIMINARY INJUNCTIONS

■ To determine whether a preliminary injunction is appropriate, the Court must consider four factors: first, whether the movant has shown a strong or substantial likelihood of success on the merits of the lawsuit; second, whether the movant has shown irreparable injury which it is suffering or will suffer if the preliminary injunction is not granted; third, whether the preliminary injunction will cause substantial harm to others; and finally, whether the preliminary injunction is in the public interest. *See, e.g., Frisch's Restaurant, Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1263 (6th Cir.1985) (Lanham Act case); *In re DeLorean Motor Co.,* 755 F.2d 1223, 1228 (6th Cir.1985); *Martin–Marietta Corp. v. Bendix Corp.,* 690 F.2d 558, 564–65 (6th Cir. 1982).

■ The standard for a preliminary injunction is flexible and the four factors are not prerequisites to be met but instead the Court must balance them. *See Frisch's,* 759 F.2d at 1263; *DeLorean,* 755 F.2d at 1229. That is, a strong showing of irreparable harm, decidedly outweighing harm to the defendant, may justify an injunction even where the movant cannot make a strong showing of likelihood of success on the merits, as long as the plaintiff can show serious questions going to the merits of the suit. *Id.*

---

**50.** *Id.*; Defendant's exhibit B at 1, 2, 9, 13, 14. The Patent and Trademark Office did not approve Worthington's application because Worthington failed to identify with sufficient specificity the goods on which Worthington places the HEARTWISE mark. *Id.* at 11. If a prospective registrant does not respond to the Office within six months, the Patent and Trademark Office considers the application to be "abandoned." *Id.* Evidently, Worthington failed to respond to the rejection of the HEARTWISE application and this failure resulted in the "abandoned" status of the application.

**51.** Transcript at II–40 to –41 (testimony of William Weintraub).

**52.** *Id.* at II–42.

**53.** *Id.* at II–16 to –17.

**54.** *Id.* at II–24 to –25.

**55.** *Id.* at II–33 to –35.

**56.** *Id.* at II–35.

**57.** *Id.* at II–49.

**58.** *Id.*

**59.** *Id.* at II–48.

**60.** *Id.*

**61.** *Id.* at II–49.

The courts have used a similar formulation of the standard for preliminary injunctions in cases filed under sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. § 1114(1) (1982); 15 U.S.C.A. § 1125(a) (West Supp.1989) (amending 15 U.S.C. § 1125(a) (1982)). These courts noted that a movant may merit preliminary injunctive relief simply upon a showing of irreparable harm and either a likelihood of success on the merits or "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc.*, 670 F.2d 642, 651 (6th Cir.) (quoting *Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 78 (2d Cir.1981)), *cert. denied*, 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982); *Central Benefits Mutual Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F.Supp. 1423, 1432 (S.D.Ohio 1989); *see National Bd. of YMCA v. Flint YMCA*, 764 F.2d 199, 201 (6th Cir.1985) (quoting *Omega Importing Corp. v. Petri–Kine Camera Co.*, 451 F.2d 1190, 1193–94 (2d Cir.1971)); *Frisch's*, 759 F.2d at 1264, 1270.

The Court, in determining the merits of the plaintiff's motion here, will first discuss Worthington's likelihood of success on the merits. This analysis will affect the Court's determination of the other factors which the Court must consider in assessing the appropriateness of injunctive relief. The Court will then turn to an analysis of possible irreparable injury to the plaintiff, the second factor to be considered. The Court will then discuss harm which the injunction could visit upon persons other than the plaintiff, the third factor, and finally, the Court will assess the impact of an injunction on the public interest. The Court will then reach a conclusion as to whether preliminary relief is justified.

## III. LIKELIHOOD OF SUCCESS ON THE MERITS

To determine Worthington's likelihood of success on the merits, the Court must take up two questions. First, the Court must determine upon *what* Kellogg allegedly infringed. Specifically, it is important to understand the nature of the mark which is the subject of this suit. Second, the Court must ascertain *how* Kellogg allegedly infringed upon Worthington's mark. Worthington asserts different theories of infringement. Thus, the Court must identify these theories and assess whether Worthington can show a likelihood of success under any one of them.[62]

Worthington, in its Complaint, asserts protection for the "HEARTWISE" name and heart-shaped design as a trademark, service mark, *and* certification mark.[63]

---

**62.** The Court finds very helpful the discussions of the various theories of infringement and the criteria of consumer confusion in an important trademark law treatise written by Professor J. Thomas McCarthy. J. McCarthy, *Trademarks and Unfair Competition* (2d ed. 1984).

**63.** The new trademark statute includes an amended definition of trademark. It provides:

The term "trademark" includes any word, name, symbol, or device, or any combination thereof—
(1) used by a person, or
(2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,
to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.
15 U.S.C.A. § 1127 (West Supp.1989). It also defines the term "service mark."

The term "service mark" means any word, name, symbol, or device, or any combination thereof—
(1) used by a person, or
(2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,
to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown.
*Id.* This section defines "certification mark" as well.

The term "certification mark" means any word, name, symbol, or device, or any combination thereof—
(1) used by a person other than its owner, or
(2) which its owner has a bona fide intention to permit a person other than the owner to use in commerce and files an application to register on the principal register established by this chapter,

The Court finds it unlikely that Worthington will prevail in showing that it has a service or certification mark which the law could protect. Instead, the Court holds that Worthington must proceed on the theory that "HEARTWISE" is a trademark, rather than a service or certification mark.

■ A service mark identifies and distinguishes the *services* of one person from the services of others. 15 U.S.C.A. § 1127 (West Supp.1989) (amending 15 U.S.C. § 1127 (1982 & Supp. V 1987)). It does not identify *goods*. 1 J. McCarthy, *Trademarks and Unfair Competition* § 4:4, at 128 (2d ed. 1984). The record contains no evidence that Worthington provides anything but food goods under the HEARTWISE name. Accordingly Worthington cannot assert an action for infringement of a service mark.

■ Also, HEARTWISE is not a certification mark. A certification mark is one which the owner allows another person to use in commerce for certifying "regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics" or that union members performed the work or labor for the goods or services. 15 U.S.C.A. § 1127; 1 J. McCarthy, *supra* note 62, § 19:32, at 945. "A symbol is not used as a certification mark if it is used to certify the owner's own products." *Id.* at 948. Since Worthington uses the HEARTWISE mark for placement on its own goods, the mark does not fall within the category of "certification marks."

Nevertheless, Worthington hoped that its HEARTWISE mark would function similarly to the way a certification mark would. Specifically, Worthington intended the mark to certify that its Morningstar Farms products meet its own standards of quality and healthiness, that it is wise for the consumer's heart. *Cf.* 1 J. McCarthy, *supra* note 62, § 19:32, at 945 (describing true certification marks). That is, Wor-

thington intended the mark to be analogous to the "Good Housekeeping Seal of Approval." [64] If Worthington had set certain standards and allowed other manufacturers to use the mark, it would serve as a true certification mark of the "Seal of Approval" variety. Since Worthington itself used the mark, it cannot be a certification mark, but given that Worthington intended it to function much as a "Seal of Approval," the HEARTWISE mark is not only a trademark, it could also be described as a "pseudo-certification mark."

Having properly defined the type of mark which the plaintiff holds, it is now possible to identify how it was that Kellogg allegedly infringed upon Worthington's mark. Worthington alleges four theories of recovery in its Complaint. First, it contends that Kellogg infringed upon Worthington's trademark. Second, Worthington posits that Kellogg engaged in unfair competition under section 43(a) of the Lanham Act, 15 U.S.C.A. § 1125(a) (West Supp. 1989). Third, Worthington argues that Kellogg's actions constitute unfair competition under the common law of Ohio. Finally, Worthington asserts a dilution claim against Kellogg under the common law of Ohio. In the memorandum in support of the motion for preliminary injunction, Worthington also argues that it has a claim based on the Ohio Deceptive Trade Practices Act, Ohio Rev.Code Ann. §§ 4165.01–4165.04 (Anderson 1980 & Supp.1989).

These federal and state laws give trademark, service mark, and certification mark holders a certain bundle of rights. Not every right, however, receives the protection of both federal and state law. Therefore, the Court finds it important to distinguish between the rights protected by the Lanham Act and those actionable under Ohio statutory and common law. *International Order of Job's Daughters v. Lindeberg and Co.*, 633 F.2d 912, 915 (9th Cir.

to certify regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics of such person's goods or services or that the work or labor on the goods or services was performed by members of a union or other organization. *Id.* The differences between the new and old definitions of these terms are not material for

purposes of this case. *See* 15 U.S.C. § 1127 (1982), *amended by* 15 U.S.C.A. § 1127 (West Supp.1989).

**64.** Transcript at I–67 (testimony of Franklin Poston).

1980), *cert. denied*, 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981).[65] Accordingly, the Court will now describe the relevant statutes and the common law, their relation to each other, and the theories of infringement actionable pursuant to them.

After discussing the relevant laws, the Court will describe each theory in turn, clarifying which body of law supports it. More specifically, the Court will consider the four theories upon which a plaintiff can proceed under the Lanham Act, the Ohio Deceptive Practices Act, and Ohio common law: palming off, the related goods doctrine, confusion of sponsorship, and reverse confusion of sponsorship. In addition, a fifth theory is available only under Ohio common law: dilution. Following a discussion of these theories, the Court will reach a conclusion as to whether the plaintiff has shown a likelihood of success under such theories, or at least sufficiently serious questions going to the merits to make them a fair ground for litigation.

## A. *The Relevant Laws*

■ Under section 43(a)(1) of the Lanham Act, any person using a word, name, or false designation of origin in connection with the sales of goods, which is likely to cause confusion or to deceive the public as to the sponsorship of the person's goods, is liable to any person damaged. 15 U.S.C.A. § 1125(a)(1) (West Supp.1989) (amending 15 U.S.C. § 1125(a) (1982)).[66] Section 43(a) supports actions for trademark infringement because the use of another's trademark, a name, symbol, or device, may create confusion as to the "origin" of his goods or as to an "affiliation, connection, or association" between his goods and the trademark holder.[67]

---

**65.** The plaintiff's assertion that "infringement of its trademark, service mark, and certification mark" is actionable separately from the Lanham Act, Ohio statutory law, and Ohio common law dangles dangerously on the precipice of the chasm into which the parties in *Job's Daughters* fell. In *Job's Daughters*, the court stated that the "parties have apparently assumed the existence of a general common law governing all trademark infringement cases brought in federal court. This assumption is incorrect. Save as an outgrowth of federal statutory or constitutional law, there is no federal common law." *Id.* The parties' lack of specificity with regard to the type of law protecting to the bundle of rights held by mark holders gives rise to the same sort of confusion.

**66.** The new statute provides:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person

. . . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

*Id.* Old section 43(a) provided:

Any person who shall affix, apply, or annex, or use in connection with any goods or servic-

es, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a) (1982), *amended by* 15 U.S.C.A. § 1125(a) (West Supp.1989). The 1988 amendments make it clear that plaintiffs can assert a confusion of sponsorship or reverse confusion of sponsorship theory under section 43(a). Nevertheless, the amendments do not change the substance of trademark doctrine associated with section 43(a).

**67.** One branch of section 43(a) doctrine is, in essence, trademark infringement law. Section 43(a) can serve as a "vehicle" or "platter" which permits parties to bring trademark suits into federal courts. Section 43(a) does not entail a body of substantive law separate and apart from the principles of trademark to be applied under state law or under the law of registered trademarks. In short, with regard to trademark infringement actions asserted under section 43(a), the Courts must apply the "traditional and time-tested" principles of trademark law. 2 J. McCarthy, *supra* note 62, § 27:3, at 349.

■ The Ohio Deceptive Trade Practices Act is substantially similar to section 43(a) of the Lanham Act. *See* Ohio Rev.Code Ann. § 4165.02 (Anderson 1980).[68] In fact, an analysis appropriate for a determination of liability under section 43(a) of the Lanham Act is also appropriate for determining liability under the Ohio Deceptive Trade Practices Act. *See, e.g., Mister Twister, Inc. v. JenEm Corp.*, 710 F.Supp. 202, 203, 204 (S.D.Ohio 1989); *Barrios v. American Thermal Instruments, Inc.*, 712 F.Supp. 611, 613 (S.D.Ohio 1988); *Jewel Cos. v. Westhall Co.*, 413 F.Supp. 994, 999 (N.D.Ohio 1976), *aff'd*, 575 F.2d 1176 (6th Cir.1978); *Cesare v. Work*, 36 Ohio App.3d 26, 26, 28, 520 N.E.2d 586, 589, 590 (1987) (paragraph one of the syllabus).

■ For the most part, the Ohio Deceptive Trade Practices Act codified the Ohio common law of trademarks. Yet, the Act does not prevent plaintiffs from relying on it and the common law simultaneously. Ohio Rev.Code Ann. § 4165.02.[69] Therefore, the theories of trademark infringement liability recognized under the Deceptive Trade Practices Act are also actionable under the common law. Moreover, the elements that tend to show trademark infringement and unfair competition under section 43(a) are appropriate for assessing a trademark infringement action under Ohio common law. *See Mister Twister*, 710 F.Supp. 203, 204. Accordingly, the theories of infringement actionable under the Lanham Act and the Ohio Deceptive Trade Practices Act are also actionable under the common law.

Having presented the applicable laws, the Court will now consider whether Worthington has shown a likelihood of success on the four theories cognizable under section 43(a) of the Lanham Act, the Ohio Deceptive Trade Practices Act, and the Ohio common law: palming off, the related goods doctrine, confusion of sponsorship, and reverse confusion of sponsorship. Following that analysis, the Court will consider the plaintiff's dilution action, which only the common law recognizes.

## B. *Palming Off*

■ Palming off occurs when a defendant attempts to bring about consumer confusion by causing consumers to purchase its products under the mistaken belief that they are in fact purchasing the plaintiff's goods. *Ameritech, Inc. v. American Information Technologies Corp.*, 811 F.2d 960, 964 (6th Cir.1987) (un-

---

68. The operative section provides:

A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:

(A) Passes off goods or services as those of another;

(B) Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(C) Causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;
...

. . . . .

(E) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have; ...

In order to prevail in an action under Chapter 4165. of the Revised Code, a complainant need not prove competition between the parties.

This section does not affect unfair trade practices otherwise actionable at common law or under other sections of the Revised Code.

*Id.*

69. The Act "does not affect unfair trade practices otherwise actionable at common law." *Id.* The statute cannot mean that it has no effect concerning all types of behavior which, but for the statute, are actionable at common law. Trademark violations are "otherwise actionable at common law," but the statute "affects" this kind of practice. Instead, the Court interprets this sentence to mean that the statute does not bar actions under the common law seeking redress for unfair trade practices. *See Mr. Gasket Co. v. Travis*, 283 N.E.2d 208, 215 (C.P.1971), *rev'd on other grounds*, 35 Ohio App.2d 65, 299 N.E.2d 906 (1973).

Support for this interpretation appears in the next section. Injunctive relief, it states, "is in addition to remedies otherwise available against the same conduct under the common law or other sections of the Revised Code." Ohio Rev. Code Ann. § 4165.03 (Anderson 1980 & Supp. 1989). Read together, sections 4165.02 and 4165.03 evince an intention "to make certain that all relief heretofore available to victims of the proscribed conduct shall continue unimpaired." *Mr. Gasket*, 283 N.E.2d at 215. Thus, plaintiffs may bring an action under the Act, under the common law, or under both.

der Ohio common law); *see Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc.,* 670 F.2d 642, 645, 646–47 & n. 3 (6th Cir.) (under section 43(a) of the Lanham Act), *cert. denied,* 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982). Palming off involves directly competing goods. *See Ameritech,* 811 F.2d at 964. The usual palming off case "involves a junior user who is attempting to trade on the goodwill associated with the well-established senior user's product." *Love v. New York Times Co.,* 691 F.2d 261, 264. (6th Cir.1982).

■ Section 43(a) establishes liability against persons who use the trademarks of others "to cause confusion" or "to deceive ... as to the origin" of his or her goods. 15 U.S.C.A. § 1125(a)(1) (West Supp.1989). Thus, the plain language of new section 43(a) encompasses palming off actions. Palming off also constitutes a "false designation of origin" and was therefore actionable under old section 43(a). *Frisch's,* 670 F.2d at 646–47. New section 43(a) retains the "false designation of origin" language which provides an alternative basis for supporting a palming off action. Also, the Ohio Deceptive Trade Practices Act expressly encompasses passing off. Ohio Rev.Code Ann. § 4165.02(A) (Anderson 1980) ("[p]asses off goods or services as those of another"). Passing off is also actionable under the Act because it causes a "likelihood of confusion or misunderstanding as to the source ... of goods." *Id.* § 4165.02(B). Finally, the common law of Ohio permits plaintiffs to recover under the palming off theory. *See, e.g., Ameritech,* 811 F.2d at 964.

The plaintiff has not "stressed the point that Kellogg may 'palm off' its products as Worthington Foods' products." Post–Hearing Memorandum of Worthington Foods at 16. Nevertheless, the plaintiff does wish to assert the theory since it believes that palming off is a "possibility."

Transcript at I–54 (testimony of Dale Twomley).

■ To evaluate Worthington's likelihood of success under the palming off theory, the Court will undertake a two-part analysis. First, the Court will determine whether consumer confusion is likely. Second, the Court will ascertain whether the plaintiff has shown that its and Kellogg's products compete directly. The plaintiff must show both a likelihood of confusion and direct competition in order to demonstrate a likelihood of success under the palming off theory.

■ The Court must examine eight factors to determine whether the allegedly infringing trade or service mark results in a "likelihood of confusion" among consumers. Specifically, they are: "(1) the strength of plaintiff's trademark; (2) the relatedness of the goods; (3) the similarity of the trademarks; (4) the evidence of actual confusion; (5) the marketing channels used; (6) the likely degree of purchaser care; (7) the defendant's intent in selecting the trademark; and (8) the likelihood of expansion of product lines." *Ameritech,* 811 F.2d at 966.[70] These factors "imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful." *Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1186 (6th Cir.1988). Instead, they are "simply a guide to help determine whether confusion would be likely to result from simultaneous use of the two contested marks." *Id.* The Court will now examine these eight factors to determine whether or not Worthington can show a likelihood of consumer confusion.

1. Strength of Worthington's HEART-WISE Mark

■ Putative trademarks fall within four categories, (1) arbitrary or fanciful, (2)

---

70. *See Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1186 (6th Cir.1988); *Little Caesar Enters., Inc. v. Pizza Caesar, Inc.,* 834 F.2d 568, 570–71 (6th Cir.1987); *Frisch's Restaurant, Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1264 (6th Cir.1985); *Carson v. Here's Johnny Portable Toilets, Inc.,* 698 F.2d 831, 833 (6th Cir.1983); *Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc.,* 670 F.2d 642, 648 (6th Cir.), *cert. denied,* 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982); *Central Benefits Mutual Ins. Co. v. Blue Cross and Blue Shield Ass'n,* 711 F.Supp. 1423, 1433 (S.D.Ohio 1989); *Mister Twister, Inc. v. JenEm Corp.,* 710 F.Supp. 202, 205 (S.D.Ohio 1989); *see also Induct–O–Matic Corp. v. Inductotherm Corp.,* 747 F.2d 358, 361 (6th Cir.1984).

suggestive, (3) descriptive, and (4) generic. *Burke–Parsons–Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 594 (6th Cir.1989); *Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 (6th Cir.1987); *Induct–O–Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 362–63 (6th Cir.1984) (quoting *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 79 (7th Cir.1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978)). These categories are not discrete, however, but instead describe points on a spectrum ranging from strong to weak; accordingly, the line between these types of marks is fine and a mark may fall within the hazy area between two categories. *See* 1 J. McCarthy, *supra* note 62, § 11:1, at 433–34.

 Fanciful and arbitrary marks are the strongest types of marks. *Little Caesar*, 834 F.2d at 571. "A 'fanciful' mark is a combination of letters or other symbols signifying nothing other than the product or service to which the mark has been assigned (*e.g.*, Exxon, Kodak)." *Id.* Arbitrary marks are slightly different. "An 'arbitrary' mark has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached. (*e.g.*, Camel cigarettes or Apple computers)." *Id.*

Two relatively weaker sorts of trademarks are suggestive and descriptive marks. *See Induct–O–Matic*, 747 F.2d at 362–64 (suggestive mark was not considered "strong" in application of the likelihood of confusion test). Suggestive marks, though, are stronger than descriptive marks. *See* 1 J. McCarthy, *supra* note 62, § 11:1, at 433.

 "A suggestive term suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods." *Induct–O–Matic*, 747 F.2d at 362 (quoting *Miller*, 561 F.2d at 79). Suggestive terms are protectible without proof of a secondary meaning attached to the mark. *Id.* at 362–63 (quoting *Miller*, 561 F.2d at 79). Proof of secondary meaning is evidence that the consumers accept and recognize a mark as denoting only one seller or source. 1 J. McCarthy, *supra* note 62, § 11:9, at 453–54.

A trademark is descriptive "if it describes: the intended purpose, function or use of the goods; the size of the goods; the class of users of the goods; a desirable characteristic of the goods; or the end effect upon the user." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1190 (6th Cir.1988), *quoted with approval in Burke–Parsons–Bowlby*, 871 F.2d at 594; *see Induct–O–Matic*, 747 F.2d at 362 (quoting *Miller*, 561 F.2d at 79). "If the mark 'imparts information directly, it is descriptive.'" *Burke–Parsons–Bowlby*, 871 F.2d at 594 (citation omitted). More specifically, descriptive trademarks directly convey the characteristics, functions, or qualities of a product to persons who are unfamiliar with it. 1 J. McCarthy, *supra* note 62, § 11:6, at 446. Descriptive marks are unprotectible unless the holder can show secondary meaning. *Burke–Parsons–Bowlby*, 871 F.2d at 594; *Wynn*, 839 F.2d at 1190; *see Induct–O–Matic*, 747 F.2d at 362 (quoting *Miller*, 561 F.2d at 79).

 "Generic" words are the weakest items on the spectrum. "A generic or common descriptive term is one which is commonly used as the name or description of a kind of goods. It cannot become a trademark under any circumstances." *Induct–O–Matic*, 747 F.2d at 362 (quoting *Miller*, 561 F.2d at 79).

The plaintiff claims that HEARTWISE is a strong trademark. It does not have a perceptible meaning to anyone hearing it for the first time and it is not descriptive of the products Worthington sells. Indeed, assuming that consumers take HEARTWISE to mean "wise for one's heart," it may refer to running shoes, a treadmill, a calorie counter, or an Ann Landers newspaper column. Until Kellogg, no other food producer had found it desirable to include "HEARTWISE" on its packaging.

Moreover, Worthington alludes to the HEARTWISE mark's economic and marketing strength, that is its fame and recognition within the relevant consumer group, aside from its inherent nature or station on

the spectrum of marks. *See generally* 1 J. McCarthy, *supra* note 62, § 11:24, at 503–05. An indirect measure of such recognition is the firm's advertising budget. Worthington's advertising budget is relatively large and the plaintiff contends that it has given the consumers an understanding of HEARTWISE as representing the plaintiff's line of healthy breakfast foods. It contends that it has already spent $10 million to $13 million on advertising and trade promotions for the HEARTWISE line of products. *See supra* text accompanying notes 25–36. Moreover, some of its advertisements have appeared in certain national magazines. *See supra* text accompanying note 26. Finally, Worthington has distributed 35 million packages of food bearing the HEARTWISE mark since 1987. Transcript at I–146 (testimony of William Kirkwood).

The defendant counters by arguing that the mark is descriptive; it tells the consumer that the product is "WISE" to eat because it is good for the "HEART." That is, HEARTWISE itself conveys a message.[71] Also, given that the plaintiff abandoned its attempted registration of "Heart Wise and Design," *see supra* text accompanying notes 49–50, it concludes that the plaintiff itself believes the mark to be weak.

■ The Court agrees with the plaintiff that HEARTWISE, assuming it means "wise for one's heart," may refer to a large number of goods or services, such as running shoes, a treadmill, a calorie counter, or an Ann Landers newspaper column. That is, in a vacuum, the mark does not directly describe any particular item. This argument, however, proves nothing. Even an obviously descriptive mark such as BLUE RIBBON does not bring to mind an exact product, but instead may refer to a myriad of products which may merit blue ribbons at contests, such as pies, cake, and pickled vegetables. Therefore, the mark

cannot escape from the descriptive category simply because it does not bring to mind any one product when scrutinized in the abstract.

■ In any case, the Court must now place the HEARTWISE mark on the spectrum of marks. In doing so, the Court finds that the plaintiff's mark is neither fanciful nor arbitrary. Unlike fanciful marks, HEARTWISE signifies more than simply the Morningstar Farms foods to which Worthington assigned it; the Court agrees with the defendant that the mark tells the consumer that the product is "WISE" to eat because it is good for the "HEART." Also, HEARTWISE is not arbitrary. HEARTWISE has a significance to the consumer recognized in everyday life, being wise for the heart. Unlike arbitrary marks, this significance is directly related to the Morningstar Farms foods to which it is attached.

The Court also finds, though, that the mark is not generic. The word "HEARTWISE" is not commonly used to describe microwaveable meat analog hot foods or meals. For example, consumer would not ask for a "HEARTWISE" when seeking a country-style breakfast containing a meat analog product.

The only remaining possibility is that the mark falls within either the suggestive classification or the descriptive category. Certainly, the mark has a descriptive element to it. That is, Worthington intended HEARTWISE to convey to the consumers as directly as possible an encapsulated message that the food is wise for the heart. Nevertheless, the consumer must also use a certain degree of imagination in gathering the message of healthiness from the mark. The consumer must understand the process by which the product can be wise for the heart before apprehending and understanding the message. In that sense, the mark seems to be suggestive as well.[72]

---

71. It is ironic that the defendant argues that the HEARTWISE mark is merely descriptive, because if the Court accepted Kellogg's argument, the Court's finding might open the way for others to sell a ready-to-eat cereal with the Heartwise name, arguing that Kellogg's Heartwise mark is also descriptive.

72. Descriptiveness and suggestiveness are not mutually exclusive in a trademark. "There is some description in any suggestion or the suggestive process will not take place." 1 J. McCarthy, *supra* note 62, § 11:20, at 490.

The distinction between suggestive and descriptive marks is fine and Worthington's mark seems to fall within the grey area between these categories. Professor McCarthy, however, presents six factors that the Court considers helpful in distinguishing between suggestive and descriptive trademarks here. 1 J. McCarthy, *supra* note 62, § 11:22, at 497–98. Two of these factors are particularly relevant in this case.

First, the distinction between suggestive and descriptive marks turns in part on how much imagination a buyer must use to "cull a direct message from the mark about the quality, ingredients or characteristics of the product or service." *Id.* at 497; *see generally id.* § 11:21, at 491–93. Second, and more specifically, it is helpful to decide whether the trademark directly conveys "a real and unequivocal idea of some characteristic, function, quality or ingredient of the product or service to a potential buyer who is not completely familiar with all aspects of the product." *Id.* at 497. This direct conveyance is in contrast with the nature of a suggestive mark. A suggestive mark may convey information but only with "some reflection" or after a "multi-stage reasoning process" on the part of the buyer. *Id.* at 498.

Here, the Court finds that a multi-stage reasoning process is necessary before the consumer can cull the message conveyed by the mark. The mark "HEARTWISE" may immediately convey the message "wise for the heart." Yet, consumers must also reflect upon the low-fat, low-cholesterol nature of the food and the connection between cholesterol and heart disease before fully comprehending the message.

Thus, stage one of a consumer's reasoning process takes place when the HEARTWISE mark invokes a concern about the health of the heart. Stage two is the consumer's apprehension of the low-cholesterol nature of the food, which the words "ZERO CHOLESTEROL," appearing outside the HEARTWISE design, aid. *See* Appendix A (facsimile of Breakfast Strips package). Stage three is the recollection in the consumer's mind of the connection between cholesterol and heart disease. Finally, stage four of the process is the inference that the food, which has no cholesterol, is "wise for the heart" because it reduces the chance of heart disease stemming from excessive cholesterol.

Of course, a consumer leaps through these stages of reasoning rapidly and spends little time in analyzing each. Nevertheless, the only way for a consumer to receive the mark's message is to go through this multi-stage reasoning process. The consumer cannot directly cull a message concerning the healthy characteristics of the good simply from looking at the mark; rather, perception of the message is indirect. Therefore, although the question is close, the Court holds that HEARTWISE falls within the suggestive category.

As a suggestive mark, HEARTWISE does not fit within the categories traditionally considered to be "strong," fanciful and arbitrary marks. HEARTWISE is weaker than fanciful and arbitrary marks. Nonetheless, HEARTWISE is stronger than marks traditionally considered to be "weak," marks which are descriptive. Instead, HEARTWISE falls within a middle ground, neither weak nor strong.

The actual market performance or consumer recognition of the plaintiff's mark in the marketplace, aside from the inherent nature of HEARTWISE as a suggestive mark, is also equivocal. Although advertising for the Worthington products is extensive, it did not necessarily create actual consumer recognition of the HEARTWISE mark. Since Morningstar Farms and the particular names of the products, such as Grillers, are much more prominent than the HEARTWISE mark on Morningstar Farms packages,[73] Worthington's large advertising budget may have raised recognition of the Morningstar Farms name and the names of the individual products, but not the HEARTWISE mark.

In sum, the plaintiff's mark, as a suggestive mark, is neither strong nor weak, and

---

**73.** *See supra* text accompanying note 64 (plaintiff uses HEARTWISE as a pseudo-certification mark, unlike defendant's use of Heartwise as the name of its cereal); Appendix A (facsimile of Breakfast Strips package).

the de-emphasis of the HEARTWISE mark in comparison with the Morningstar Farms mark and the name of individual products within the line casts doubt on the recognition of the mark in public in spite of Worthington's significant advertising budget. Therefore, on the current record, the Court concludes that the first factor to be considered in assessing the likelihood of confusion, strength of the plaintiff's mark, neither increases nor decreases the likelihood of confusion.

2. Relatedness of the Goods

The second factor to consider in assessing the likelihood of confusion is the relatedness of the parties' goods. The plaintiff contends that its breakfast foods are related to Kellogg's cereal. Indeed, Worthington must, and indeed does, contend that its HEARTWISE line of breakfast foods is similar to Kellogg's cereal to the extent that the parties' goods compete directly; such an argument is necessary in order to support its palming off theory.

The plaintiff argues that its substitute eggs, sausage links, sausage patties, meat strips, french toast, pancakes, and hash browns as well as Kellogg's Heartwise cereal are all easy-to-prepare, reasonably-priced breakfast foods found in the grocery store.[74] Transcript at I–30 (testimony of Dale Twomley). They provide nourishment in the morning meal and thus all serve the same function. In that sense, even a grapefruit could serve as a substitute for Worthington's products and would be a competing product. Transcript at I–109 (testimony of Franklin Poston).

Worthington contends that some consumers choose Kellogg's cereal in favor of Worthington's products. This choice entails that such consumers are choosing one "HEARTWISE" product over another and are not likely to eat both. Post–Hearing Memorandum of Worthington Foods at 14–15. Worthington's essential point is that there is a group of consumers who would purchase Kellogg's cereal instead of one of Worthington's products and the plaintiff would lose sales as a result. *See* Transcript at I–109 (testimony of Franklin Poston).[75]

The defendant replies by noting that the meat analog products of the defendant are not at all like Kellogg's Heartwise cereal. Consumers easily can differentiate between cold breakfast cereal on one hand and cooked egg, sausage, french toast, and pancake products on the other. Worthington's foods, which requires cooking preparation, are substitutes for traditional breakfast items such as eggs, sausage links, sausage patties, bacon, french toast, pancakes, and hash browns. Kellogg's product, on the other hand is a cereal. It consists of crunchy flakes or nuggets and consumers eat it cold with milk.

 One analogous body of law sheds light on the issue of direct competition between goods, namely market definition under section 2 of the Sherman Anti–Trust Act, 15 U.S.C. § 2 (1982). Professor McCarthy, in his seminal trademark treatise, states that products which are "competitive" for purposes of trademark analysis are "goods which are reasonably interchangeable by buyers for the same purposes." 2 J. McCarthy, *supra* note 62, § 24:6, at 182 (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) (central station security services are in a distinct relevant market); *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) (in analysis of section 7 of the Clayton Act, men's, women's and children's shoes were in separate relevant submarkets); *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) (cellophane is in the same relevant market with other wrapping materials)). Determining wheth-

---

**74.** Of course, the Court notes that the plaintiff's goods and dry cereal are not exclusively breakfast cereal. Some persons eat such items at other times of the day as, for instance, a midnight snack.

**75.** Interestingly, this argument contradicts another position taken by Worthington, that it is possible for the products to be eaten at the same meal. *Id.* at I–34 to –35 (testimony of Dale Twomley). Such an argument suggests that the products are complementary rather than direct substitutes.

er products are "reasonably interchangeable" is the analysis which the Court must undertake when defining the relevant product market in an action under section 2 of the Sherman Act. The Court holds that the same analysis is helpful for determining whether the parties' goods are "directly competing" for purposes of assessing palming off liability.

A relevant product market includes all products that are either identical or available substitutes for each other. *White and White, Inc. v. American Hosp. Supply Corp.*, 723 F.2d 495, 500 (6th Cir.1983). To determine whether products are "available substitutes" or "reasonably interchangeable," the Court must first scrutinize the uses of the product. It must assess whether the products can perform the same function. *Id.* The second factor to weigh is consumer response, or more specifically, cross-elasticity.[76] That is, the Court must assess to what extent consumers will choose substitutes for the parties' goods in response to price increases. *White and White*, 723 F.2d at 500.

■ Here, the Court finds that the uses of Worthington's products are different from those of Kellogg's goods. On one hand, consumers purchasing Worthington's products seek a hot meal, brought from a frozen to a hot state in a microwave or regular oven. On the other hand, consumers place ready-to-eat cereals in a bowl, unheated, and pour cold milk on them. Cereal consumers choose Heartwise cereal when they desire, or are willing to eat, a cold meal.

Worthington argues, however, that in a broad sense any inexpensive breakfast food could be a substitute for its products. All such foods provide nourishment to some extent at the morning meal and for that reason they serve the same function. The Court, though, rejects this argument; it

sweeps too broadly. Worthington is correct in noting, as a theoretical matter, it is possible that any food could be a substitute for any other; if Worthington's products became unavailable or prohibitively expensive, people would find something else to eat. Nevertheless, as a practical matter this is not true. Only certain foods are likely, reasonable substitutes for others in the context of today's wealth of foods available in modern grocery stores. That is, if eggs were unavailable, a consumer would not need to turn to asparagus, but instead could purchase closer substitutes such as Scramblers or cheese. Thus, the relevant market is much more limited than the unreasonably broad purported market consisting of "inexpensive breakfast foods."

Moreover, although consumers use both products as a healthy food, Worthington's products have a special use as meat analogs, a use which Kellogg's cereal does not share. Worthington's products are direct substitutes for meat, eggs, and so on. These products look, taste, and have the same texture as real meat and eggs. By contrast, Heartwise cereal consists of dry, crunchy flakes or nuggets. They cannot possibly serve as meat or egg analogs.

The second market factor to be considered is consumer response or cross-elasticity. Unfortunately, the parties did not present evidence concerning any tendency or lack of tendency of consumers to switch from the plaintiff's products to the defendant's if Worthington were to raise its prices or vice versa. Therefore, the Court cannot conclude that the plaintiff has demonstrated cross-elasticity of the parties' products indicating that their goods are in the same relevant market.

In short, on an examination of the current record, the Court, finds that Worthing-

---

**76.** Landes and Posner, however, criticize the use of "cross-elasticity of demand" in discussions of market definition, because of its ambiguity. Landes & Posner, *Market Power in Antitrust Cases,* 94 Harv.L.Rev. 937, 960–61 & n. 43 (1981). The term may be a reference to a high degree of substitution, causing the firm to face a high elasticity of demand in general, which entails a broad market definition and indicates low market power. *See id.* at 960. The term

may also be an allusion to substitution *only at the current price* of a firm's goods, though Landes and Posner note that this limited kind of substitutability may indicate rather than preclude market power; a monopolist faces product substitution and elastic demand at the profit-maximizing output and price. *See id.* at 942 & n. 11, 961. For purposes of this discussion, the Court refers to the first meaning of cross-elasticity, rather than the second.

ton's goods are not in the same relevant market as Kellogg's cereal. The parties' products have different uses or functions. Also, the Court has no evidence of any degree of cross-elasticity between the plaintiff's foods and the defendant's cereal.

Even if the Court were to accept the plaintiff's argument that all breakfast foods, as possible substitutes for each other, are in one relevant market, certain "submarket criteria" suggest that the parties products are in separate relevant submarkets. The use of certain submarket criteria, which the Supreme Court presented in *Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), is a supplement to the market test to determine if the parties' goods are in the same relevant market. *White and White,* 723 F.2d at 500; *see Hand v. Central Transp., Inc.,* 779 F.2d 8, 11 (6th Cir.1985); *Borden, Inc. v. Federal Trade Comm'n,* 674 F.2d 498, 510 (6th Cir.1982), *vacated and remanded on other grounds,* 461 U.S. 940, 103 S.Ct. 2115, 77 L.Ed.2d 1298 (1983).

■■■ Goods which are in the same market but in different submarkets do not compete directly and are not in the same "relevant product market" for purposes of the antitrust laws. A submarket may be determined by examining such practical indicia as (1) "industry or public recognition of the submarket as a separate economic entity," (2) "the product's peculiar characteristics and uses," (3) "unique production facilities," (4) "distinct customers," (5) "distinct prices," (6) "sensitivity to price changes," and (7) "specialized vendors." *Brown Shoe,* 370 U.S. at 325, 82 S.Ct. at 1524, *quoted with approval in White and White,* 723 F.2d at 501.

The first criterion, recognition of the submarket as a separate entity, enjoys only incomplete illumination from the record here. The parties presented no evidence that the public recognizes a submarket for ready-to-eat cereals apart from the submarket for microwaveable meat analog hot breakfast foods, although such recognition is likely. The Court does, however, have some evidence that the industry considers the markets or submarkets for the parties' goods to be separate, specifically the conduct of the parties themselves.

When the Court asked Worthington's president what its *direct* competitors were, he responded that no company produces a directly competing analog product and that only Egg Beaters competes with its Scramblers egg substitute. Transcript at I–29 to –30 (testimony of Dale Twomley). Although Worthington tracks the market reports concerning competitors, it concentrates its scrutiny on others' frozen food products, not cereal, since it is most concerned about frozen food products as its, more or less, direct competition. *Id.* at I–108 to –09, I–117 to –18 (testimony of Franklin Poston).

Similarly, Kellogg seeks to compete with other producers of ready-to-eat cereals; such manufacturers are Kellogg's direct competition. Kellogg considers the cereal market or submarket to be distinct from that of other breakfast foods. It does not track the performance of Morningstar Farms products as its competition. *Id.* at II–29 to –32 (testimony of William Weintraub).

In short, both parties conduct their market analyses under the assumption that microwaveable meat analog hot foods are not in the same submarket, or even the same market, as ready-to-eat cereals. The Court finds that the parties are typical of companies in the food industry. Thus, their behavior should be typical of the industry in general as well. This conduct, then, provides some evidence that the industry recognizes the parties' products as being in separate markets or submarkets which are distinct economic entities, the first submarket criterion.

Another submarket criterion is the presence or absence of peculiar characteristics and uses of the parties' products. Here, the plaintiff's food has one particular characteristic. Specifically, it contains meat substitutes. In place of real meat, which is an integral part of many ordinary breakfasts, Worthington's foods contain egg whites and soy products, which serve as analogs to meat. Worthington uses these ingredients to make foods which have the appearance of real eggs, sausage, bacon, and so on. Kellogg's products, by con-

trast, are not substitutes for anything. They are themselves a staple in ordinary breakfasts.

The record contains no evidence concerning unique production facilities, the third submarket criterion. The record does, however, indicate that the plaintiff's products appeal to "distinct customers," the fourth submarket criterion. In specific, Worthington's products appeal in large part to vegetarians. Although more and more Americans are becoming vegetarians, they are nonetheless a small, discrete minority of consumers. *See supra* text accompanying note 4.[77]

In sum, at this preliminary stage of the lawsuit, the court's examination of the parties' products suggest that they are in separate relevant markets. Their use or function is different and the plaintiff has not shown a cross-elasticity between them. Even if the parties' goods were in the same broad market, the submarket criteria strongly suggest that they would be in separate submarkets. Thus, the Court concludes that Morningstar Farms products and Kellogg's Heartwise cereal are not "directly competing" within the meaning of the Lanham Act or state trademark law.

Confusion in a palming off case involves the mistaken belief of consumers that they are purchasing the plaintiff's goods when they are, in fact, purchasing the defendant's. For this type of confusion to take place, the items must be directly competing goods. Given the Court's conclusion that Worthington's and Kellogg's foods do not compete directly, confusion of the kind seen in palming off cases is impossible. Although the lack of direct competition does not preclude other kinds of confusion, it does preclude liability under the palming off theory. Thus, the relatedness of the goods factor weighs decisively against a finding of consumer confusion under the palming off theory.

### 3. Similarity of the Marks

■ The third factor which enters into the determination of whether a likelihood of confusion exists is the similarity of the parties' competing marks. In deciding whether the marks are similar, the Court must refrain from side-by-side comparisons of the marks in question. *Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1187 (6th Cir.1988); *WSM, Inc. v. Tennessee Sales Co.,* 709 F.2d 1084, 1087 (6th Cir.1983). A defendant can often point out minute differences which, upon intense scrutiny, would seem to distinguish the parties' marks. Such differences, though, may not register in the minds of consumers who may be confused upon seeing the defendant's mark. Moreover, the Court must not focus on certain "prominent" features that both parties' marks have in common, to the exclusion of others which cause the parties' marks as a whole to create in the minds of consumers quite different impressions. *See Little Caesar Enters., Inc. v. Pizza Caesar, Inc.,* 834 F.2d 568, 571 (6th Cir.1987) (quoting 2 J. McCarthy, *supra* note 62, § 23:15, at 80). Thus, the Court must refrain from dissecting the conflicting marks and comparing their corresponding parts. "It is the impression which the mark as a whole creates on the average reasonably prudent buyer and not the parts thereof which is important." *Id.*

Nevertheless, certain parts of the mark may be "dominant" in their ability to influence the total impact of the mark on consumers, in comparison with more "peripheral" parts of the mark. 2 J. McCarthy, *supra* note 62, § 23:15, at 84. Thus, if the dominant segments of the competing marks are the same, consumer confusion concerning the marks as a whole may be likely in spite of differences in the "peripheral" parts of the marks. *Id.*

Therefore, to determine whether the marks are similar, the Court must ascertain whether a person "having a general recollection" of the plaintiff's mark would

---

**77.** The record contains little evidence concerning the pricing of the parties' foods, the fifth submarket criterion. It is clear that the products are relatively inexpensive, though the record contains no specific pricing data. Also, the record is silent concerning the final submarket criteria, sensitivity to price changes and specialized vendors.

be likely, upon seeing the defendant's mark, "to assume that both emanate from the same source or connected sources." *WSM*, 709 F.2d at 1087; *see Wynn*, 839 F.2d at 1187 (court must determine if marks would be confusing if "singly presented"). When one mark is a composite consisting of both a design and a word and the other mark consists only of a word, the first step in the analysis is to determine whether the word or the design dominates the composite mark. 2 J. McCarthy, *supra* note 62, § 23:15, at 87. If the dominant part of the composite mark is the word, then the Court must compare the parties' word marks aside from the design. If the words used are the same or confusingly similar then confusion may be likely even if "peripheral differences" divide the competing marks, *id.* at 84, such as the design associated only with the composite mark. Again, it is the mark as a whole which the Court must consider. *Id.* at 86.

Here, the Court finds that the word segment of the Worthington's mark is dominant. As between the heart-shaped design and the word "HEARTWISE," it is the word segment which conveys the suggestion of healthiness which the plaintiff intends. The heart-shaped design merely augments the message conveyed by the word.

Given that the word segment of the plaintiff's mark is the dominant part, the Court must now compare the HEARTWISE name on the plaintiff's design to the Heartwise mark used on Kellogg's cereal. In gauging the similarity of the competing word marks, a "proper analysis ... includes examining the pronunciation, appearance, and verbal translation of conflicting marks." *Wynn*, 839 F.2d at 1188 (citing 2 J. McCarthy, *supra* note 62, § 23:4).

■ Of course, the Court must consider the marks "in light of what occurs in the marketplace." *Id.* at 1187. One such factor to consider when assessing what happens in the marketplace is the trade dress context in which the marks appear. This factor is relevant when the similarity of marks is a close question. The total effect of the "background" impression pro-

duced by the "shape, color and design of packaging and containers" may either "intensify or dilute any confusion" between the parties' marks.[78]

■ Worthington argues in this case that the parties' marks are similar. It notes that the words "HEARTWISE" on the plaintiff's products and the word "Heartwise" on the defendant's cereal are identical in sight, spelling, and pronunciation. Despite the fact that the graphic images appearing around the words appearing on the parties products are not identical, the plaintiff contends that on both products, the word "HEARTWISE" appears at the center of a graphic with eye-catching properties.

By contrast, Kellogg contends that obvious visual and conceptual differences distinguish the parties' marks. It states, in specific, that the two marks perform distinct functions. Kellogg's Heartwise mark is the name of its cereal. Worthington's HEARTWISE, however, simply conveys product information concerning the healthiness of its food.

On the face of it, an analysis of the two word marks used, HEARTWISE by the plaintiff and Heartwise for the defendant's cereal, suggests that the marks are almost identical. First, the two marks are pronounced the same. Accordingly, the "sound" of the two marks is identical.

As for the appearance, or "sight" of the marks, the Court must consider both the spelling of the marks and the style of lettering or typeface. The lettering style of trademarks is relevant because the use of another's distinctive lettering style may engender confusion, even if the wording of the marks is slightly different. 2 J. McCarthy, *supra* note 62, § 23:15, at 92–93 (citing *Coca–Cola Co. v. Gemini Rising, Inc.*, 346 F.Supp. 1183 (E.D.N.Y.1972)); *see WSM, Inc. v. Tennessee Sales Co.*, 709 F.2d 1084, 1085–87 (6th Cir.1983) (liability imposed for copying "OPRYLAND" T–Shirt design and selling "MUSIC CITY" shirts, on which lettering styles were substantially similar). If the lettering styles of the competing marks are different, however, confusion is less likely, though such a difference does

**78.** 2 J. McCarthy, *supra* note 62, § 23:18, at 99.

not insulate the defendant from liability. J. McCarthy, *supra* note 62, § 23:15, at 92.

Here, the parties' marks are similar in appearance, but not identical. They are identical in one way because they are spelled in exactly the same way. Nevertheless, the lettering of the marks is different. Specifically, the typefaces are quite dissimilar. Worthington's HEARTWISE mark consists of all capital letters in one kind of typeface, while Kellogg's Heartwise mark has both upper and lower case letters in a distinct typeface. *Compare* Appendix A *with* Appendix B. Moreover, the lettering differs in size. The plaintiff's lettering is tiny in comparison to Worthington's, due in large part to the different functions the parties' marks serve. *See supra* text accompanying notes 18–20, 44 (size of marks); *supra* text accompanying note 64 (Worthington's mark is a pseudo-certification mark while Kellogg's is the name of the cereal itself).

The final factor to consider when assessing the similarity of the parties' word marks is their meaning. In this case, the meaning of Worthington's HEARTWISE mark is the same as that of Kellogg's Heartwise mark, since they invoke the same idea of the product being good for the consumer's heart. They allude to the fact that eating foods which are low in cholesterol reduces the probability of heart disease.

Assessing the three factors relevant to the similarity of word marks, the Court reaches the provisional conclusion that the marks are similar. The pronunciation, spelling, and meaning of the words are identical. The difference in lettering reduces the possible confusion, but does not eliminate the similarity.

■■■ All things considered, however, several factors considerably reduce the likelihood of confusion stemming from the apparent similarity of the parties' word marks. The defendant asserts, for instance, that the use of the "Kellogg's" house mark tends to dispel confusion. The plaintiff counters by citing a number of cases for the proposition that the use of a house mark is irrelevant in determining liability when the parties are using identical trademarks. *Electronics Corp. of Am. v. Republic Indus., Inc.*, 507 F.2d 409, 410 & n. 2 (1st Cir.1974) (per curiam), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1679, 44 L.Ed.2d 102 (1975); *Miller Brewing Co. v. Carling O'Keefe Breweries of Canada, Ltd.*, 452 F.Supp. 429, 444 (W.D.N.Y.1978); *Kellogg Co. v. New Generation Foods, Inc.*, 6 U.S.P.Q.2d (BNA) 2045 (Trademark Trial & App.Bd.1988).[79] The Court, however, rejects a per se rule that the use of house marks can never dissipate consumer confusion in the use of identical marks. 2 J. McCarthy, *supra* note 62, § 23:15, at 82. The Court cannot adopt such an approach, because it must compare the parties' marks as a whole, rather than only the name which both parties use in their marks. *Id.* The house mark can be part of the "mark as a whole" and is therefore relevant.

Certainly, the use of a house mark does not automatically preclude the defendant's liability. House marks are, nonetheless, one factor which the Court must consider in the calculus of the likelihood of confusion. *Id.* at 90–91; *see id.* at 83–84 (quoting *Decatur Fed. Sav. and Loan Ass'n v. Peach State Fed. Sav. and Loan Ass'n*, 203 U.S.P.Q. (BNA) 406, 412 (N.D.Ga. 1978)). Specifically, the house mark of a company tends to deemphasize the contested mark as a source of the goods or services. *See Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1265 (6th Cir. 1985). Thus, the Court holds that the display of a company's own familiar mark on a product reduces the likelihood of confusion which might stem from the simultaneous use of another's mark. 2 J. McCarthy, *supra* note 62, § 23:15, at 91.[80] Here,

---

**79.** In *Kellogg,* the Trademark Trial and Appeal Board held that Kellogg's failure to mark packages of cereal sent to a research marketing firm for testing with a label bearing the cereal's net weight did not violate statutes governing labelling which would warrant the cancellation of Kellogg's registration. *Kellogg,* 6 U.S.P.Q.2d (BNA) at 2047–48. The case has nothing to do

with house marks used in conjunction with others' trademarks.

**80.** In *Frisch's,* the court considered an arrangement in which Marriott Corporation licensed various companies to have the exclusive use of the service mark "Big Boy" in different states. The plaintiff contended that Shoney's operation

the defendant sells its cereal with the Kellogg's mark which the defendant prominently displays on its cereal packages directly above the Heartwise name. Therefore, the likelihood of confusion is much smaller than a comparison of the plaintiff's HEARTWISE and the defendant's Heartwise word marks alone would suggest.

Another factor which weighs against the likelihood of confusion in spite of the facial similarity of the marks is the different functions which the parties' marks serve. Worthington's mark is of a different kind than Kellogg's. Worthington intended to create a mark similar to the "Good Housekeeping Seal of Approval." The Court called this kind of mark a "pseudo-certification mark." *See supra* text accompanying note 64.

Worthington, then, uses three kinds of marks. First, the plaintiff employs the "Morningstar Farms" name for an entire line of goods. Second, it assigns to each individual product a name such as "Grillers." Third, the plaintiff utilizes the HEARTWISE pseudo-certification mark as a supplemental way of distinguishing its products. The limited purpose of the HEARTWISE mark was evident when the Court asked the plaintiff's marketing director which mark Worthington would be willing to sacrifice, if forced to abandon one of the three kinds of marks it uses. In other words, the Court wished to discover which mark is most crucial in Worthington's view for denoting the source of its goods. The director admitted that the one

he would eliminate first would be HEARTWISE. Transcript at I–119 to –120 (testimony of Franklin Poston).

By contrast, Kellogg uses the Heartwise as the name of a particular kind of cereal. Its packages do not contain a pseudo-certification mark the way Worthington's do. Accordingly, consumers with a general recollection of Worthington's HEARTWISE mark may find the Grillers or Morningstar Farms names so dominating that when they later see Kellogg's Heartwise mark on its cereal, any recollection of Worthington's HEARTWISE would be accompanied by a remembrance of the plaintiff's Grillers or Morningstar Farms name as well. These names would serve as the dominant marks distinguishing Worthington as the source of the goods. Consumers would therefore compare dominant marks to dominant marks, Heartwise and Kellogg's to Grillers and Morningstar Farms. Worthington's HEARTWISE therefore serves only a secondary distinguishing function. It is less likely, therefore, that consumers will be confused about the source of the products than if the house mark or name of a Worthington food product were HEARTWISE. Accordingly, the simultaneous use of HEARTWISE is unlikely to cause confusion.

Given that these factors as well as the difference in lettering of the marks tend to dispel confusion and make the question of similarity a close one, the Court also finds it helpful to consider the trade dress of the parties' products. In such cases, the trade

---

of its "Shoney's Towne and Country" Restaurants in Florida and Kentucky violated Frisch's right to use the "Big Boy" name in those states. Shoney's operated under the "Big Boy" name in other states and Frisch's contended that Shoney's had become linked to "Big Boy" in the minds of the consumers. Specifically, " 'Shoney's' has become so notoriously associated with 'Big Boy' beyond the former Shoney's license areas that mere use of the 'Shoney's' mark in Ohio, Kentucky, Indiana and Florida invokes, for the public, the unspoken 'Big Boy' mark" in violation of Frisch's exclusive right to the name. *Frisch's,* 759 F.2d at 1266.

In discussing the strength of the Big Boy mark, the court noted that the defendant emphasized its house mark, the Shoney's name, when advertising its restaurants. This emphasis underscored its independence from the other

"Big Boy" operation and therefore identified itself as the source of the services. *Id.* at 1265. The court noted that the Shoney's name was well-known in large portions of the country; therefore the emphasis of the "Shoney's" name over the subsidiary "product line" mark, such as "Big Boy" or "Towne and Country," reduces the likelihood of confusion. *Id.* at 1266–67.

*Frisch's,* of course, presents an extreme case. The Shoney's mark was strong in relation to the Big Boy mark to the extent that it became the dominant mark, entitled to more protection than the Big Boy mark. *Id.* at 1266 n. 1. Nevertheless, the Court holds, in accord with the Second Circuit, that when "similar marks are always presented in association with company names, the likelihood of confusion is reduced." *Vitarroz Corp. v. Borden, Inc.,* 644 F.2d 960, 969 (2d Cir.1981).

dress is one aspect of the context in which the parties sell their goods and such context may either enhance or diminish consumer confusion. *See supra* text accompanying note 78.

In this case, Worthington's trade dress is almost completely devoid of any similarities to Kellogg's trade dress. Each of the plaintiff's products contains a large picture of the relevant foods, a prominent display of the Morningstar Farms mark and design, as well as written information. The box top, bottom, and side are bright orange. On the reverse side, Worthington printed serving and nutritional information. *See* Appendix A (facsimile of Breakfast Strips package). By contrast, Kellogg's product appears in a blue or purple box. Kellogg's relatively uncluttered box front contains, besides the Heartwise name and Kellogg's house mark, certain information about the product and a large picture of a bowl containing the cereal. The box sides contain nutritional information and a recipe. The rear of the box contains a written message concerning diet, fiber, and cholesterol as well as the Henry Ford Hospital Heart and Vascular Institute mark and a picture of a spoon. *See* Appendix B (facsimile of Kellogg's Heartwise cereal box). Again, this dissimilarity further vitiates the apparent similarity of the parties' marks.

The Court concludes that given the identical pronunciation, spelling, and meaning of the competing marks, the similarity of marks factor increases the probability of confusion. Such similarity, however, is undercut almost completely by dissimilarities in the lettering which the parties use for their marks, the prominent Kellogg's house mark, the different functions of the marks, and the distinctions between the trade dress used by each company. Accordingly, the Court concludes that this factor enhances possible confusion only a minuscule amount.

4. The Evidence of Actual Confusion

■ "Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion. Yet, it does not follow that lack of evidence of actual confusion should

be a significant factor...." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1188 (6th Cir. 1988); *see Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1267 (6th Cir.1985); *Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc.*, 670 F.2d 642, 648, 650 (6th Cir.), *cert. denied*, 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982). Since the Court must determine the *likelihood* of confusion, evidence of *actual* past confusion is only one factor to be considered. *See Wynn*, 839 F.2d at 1188.

The plaintiff proffered no evidence that actual confusion has taken place. Transcript at I–101 (testimony of Franklin Poston). Worthington has not conducted market studies showing actual confusion. *Id.* at II–55 to –56 (testimony of Dale Twomley). This lack of evidence, though, is not fatal, for as Worthington argues, Heartwise cereal only recently began sales. Therefore, "there has been no real opportunity for actual confusion." *Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 572 (6th Cir.1987).

■ Kellogg, by contrast, states that it has received no complaints concerning confusion or reverse confusion of sponsorship. Transcript at II–54 (testimony of William Weintraub). Moreover, Kellogg presents the results of a study produced by Dr. Jacob Jacoby as support for the proposition that consumers have not been confused about the source, connection, sponsorship, or affiliation of the parties' foods and these products will not likely confuse them in the future.[81] Dr. Jacoby notes that this study was a "pilot investigation," *id.* at II–91, because he interviewed only fifty persons in two shopping malls, twenty-five persons in a suburb of Denver and twenty-five in New York, *id.* at II–75 to –76, II–78, II–87. Nevertheless he felt "great comfort and confidence" that the findings in a full-scale study would not differ significantly from those of the pilot. *Id.* at II–91.

Dr. Jacoby testified that he intended to determine whether or not "consumers would identify the Morningstar Farms products using the name Heartwise" and also to ascertain "whether or not consumers would confuse the Morningstar Farms

81. *See generally* Transcript at II–69 to –97 (testi- mony of Jacob Jacoby).

product with the Heartwise product of Kellogg's." *Id.* at II–72 to –73. Dr. Jacoby's study attempted to accomplish this by constructing an appropriate questionnaire and hiring an independent marketing research firm to administer it. *Id.* at II–73 to –75. The research firm staff approached persons in the two shopping malls chosen and asked them a series of questions after leading the interviewees into an enclosed testing facility. *Id.* at II–82.

At the test site, the questioners allowed the interviewees to see Worthington's Breakfast Strips, Kellogg's Heartwise cereal and four other products, one at a time and in a random order. *Id.* at II–81, II–83, II–85. The interviewers asked the interviewees to name each product and to say which company produces it. *Id.* at II–84, II–85. The interviewees were then free to look at any or all of the products together and the interviewers then asked whether any of the products were made or sponsored by the same company. *Id.* at II–86.

The results of the study show that none of the fifty persons interviewed identified the Breakfast Strips product as having "HEARTWISE" as its name. All fifty interviewees thought that Morningstar Farms was the maker of the product. Moreover, all fifty listed the name of the Kellogg product as "Heartwise" and forty-eight of fifty interviewees thought Kellogg was the manufacturer. None of the fifty interviewees thought that the Worthington and Kellogg products came from the same source. *Id.* at II–88 to –89. Jacoby therefore concludes that "there is no shred, no inkling, nothing, not even one respondent who indicated any confusion" between Worthington's Breakfast Strips and Heartwise cereal. *Id.* at II–91.

Worthington, however, lodged a series of methodological criticisms of the study in order to discredit its findings. The plaintiff first complains that the results are not probative on the legally-relevant question, whether consumers who have a general recollection of the plaintiff's mark would be confused upon seeing the defendant's mark later. The plaintiff's complaint is persuasive to a point.

The Sixth Circuit's test for the similarity of marks requires the Court to determine whether a consumer "having a general recollection" of the plaintiff's mark would be likely, upon seeing the defendant's mark, "to assume that both emanate from the same source or connected sources." *WSM*, 709 F.2d at 1087; *see Wynn*, 839 F.2d at 1187 (a court must determine if marks would be confusing if "singly presented"). Evidence of actual confusion would consist in part of a showing that persons, having a general recollection of the plaintiff's mark, actually have assumed that both marks emanate from the same or connected sources upon seeing the defendant's mark, that is, that consumers in the past really have been confused upon seeing the defendant's mark *after* the plaintiff's.

In this study, however, the questioners made no attempt to determine, directly or indirectly, if the interviewees had a general recollection of the plaintiff's mark prior to the interview. *Id.* at II–92 to –94, II–96 to –97. Moreover, the questioners showed the products to the individuals being questioned in a different sequence in order to eliminate order bias. Transcript at II–81 (testimony of Jacob Jacoby). In other words, some of the individuals may have seen Worthington's product first, and therefore could say whether they were confused upon seeing the defendant's cereal. Yet others saw Kellogg's cereal first and therefore could not articulate confusion about Breakfast Strips upon seeing the cereal for the first time.

Accordingly, interviewees may not have had a previous exposure to Worthington's mark to give them a general recollection of the plaintiff's mark so that, upon seeing the defendant's product, the interviewees could have voiced possible confusion arising from the defendant's product. Therefore, the first series of questions concerning the name and manufacturer of each product would not provide an accurate measure of the legally relevant confusion, that is, confusion stemming from seeing the defendant's mark *after* seeing the plaintiff's mark.[82] The interview should

---

82. The standard for the similarity of the marks requires an analysis of what consumers would

think when seeing the plaintiff's mark first and

have been designed to implant in the interviewees' minds an impression of the plaintiff's mark *prior* to any questions concerning possible confusion arising upon seeing the defendant's mark.

The second set of questions, however, eliminates almost entirely the effect of this flaw. Specifically, the interviewers asked a follow-up series of questions to determine if the interviewees perceived a connection between the sources of the products. At that time, the interviewees would have had a general recollection of Worthington's product and could express any confusion which might exist upon seeing the defendant's cereal again.[83]

The plaintiff's second complaint is that the study is not relevant to all eight factors which are probative as to the likelihood of confusion, but instead focuses on only one of them, actual confusion. Certainly, the plaintiff is correct in noting that the study addresses only present, actual confusion as a basis for estimating likely future confusion and cannot be probative on the other factors. Yet this complaint is not a good reason for limiting its probative value on the question of actual confusion. A study focusing only on actual confusion can serve the limited purpose of aiding the Court's determination of the effect of the actual confusion factor. Accordingly, this argument is completely unpersuasive.

The plaintiff's third objection to the Jacoby study is that it made no attempt to select reasonable customers of average intelligence and experience. Such persons do not conduct a detailed, painstaking analysis of the goods they are purchasing. The Court dos not find that the study forces the interviewees to conduct an analysis so painstaking that it is out of step completely with common experience. Certainly, the questions may force some, who would not normally think at all about the products they buy, to consider them with a certain amount of attention. Yet the interviewees could be as cursory as they chose when answering the questions, which they might do if they felt a reasonable temptation to limit the time they would spend in answering a series of questions posed by strangers conducting market research in a mall after interrupting their normal routines. In short, the plaintiff's concern is valid but is unlikely to affect the probative value of the study.

The plaintiff's fourth contention concerning the study is that Dr. Jacoby started his research only a short while after grocery stores had begun to sell Heartwise cereal. Consumers had not had time to digest the defendant's Heartwise mark. Although consumers now and in the future might mistakenly believe that Kellogg made or sponsored Worthington's foods, the Jacoby study could not uncover such a phenomenon, given its early completion date. As a theoretical matter, the plaintiff's contention is sound. Kellogg may be too new to generate actual confusion. Nevertheless, this argument proves little. On the current state of the record, Worthington can show neither actual nor likely confusion. If, at a later time, actual confusion arises, Worthington may have a cogent argument to present. Kellogg's study, however, tends to show no actual confusion and no likelihood of confusion at this time. It does not purport to prognosticate events far in the future.

the defendant's second. The particular ordering with which potential consumers see the marks is important because the standard attempts to force a court to focus on what actually occurs in the marketplace. Consumers do not always make careful side-by-side comparisons. Moreover, the crucial question is whether the *defendant's* mark causes confusion among persons who have seen the *plaintiff's* mark and not vice versa.

83. The Court is concerned, though, that at this follow-up stage, the interviewees had the opportunity to do a thorough side-by-side comparison of the marks, if they were observant enough to note the common use of the HEARTWISE mark. *See supra* note 82. Each interviewer "placed all six products out in front of the respondent." *Id.* at II–86. Of course, consumers dragged from the mall may not wish to spend much time doing such a side-by-side comparison, but this factor theoretically may introduce some inaccuracy into the results of the study. As a practical matter, though, the Court does not find that this factor casts much doubt on the results, given the likely understandable apathy of the interviewees.

The plaintiff's fifth methodological argument against the Jacoby study's findings is that Dr. Jacoby failed to select for his sample health-conscious, meat-avoiding consumers who would be the universe of potential purchasers of the parties' products. The Court finds it plausible that the group of consumers who would eat meat substitutes is likely to be a relatively small subset of the group of consumers which eats ready-to-eat cereal.[84] Yet, the plaintiff stresses how widespread the consciousness about health has become among consumers. Although vegetarianism is not common, then, health-consciousness and meat avoidance are widespread. The Court, therefore, cannot conclude a priori that the subset of health-conscious, meat-avoiding consumers would differ from the persons interviewed in its ability to discern products of one company from another to an extent which would skew Dr. Jacoby's findings.

The plaintiff's final contention undercutting the Jacoby study is that the interviewees examined the products in the isolation of an enclosed interviewing area. Id. at II–82. The study did not take place in a grocery store and did not account for the bombardment of sensory data received by the consumer in the hustle and bustle of the typical supermarket environment. This criticism is sound.

Consumers tend to be more rushed when shopping at a grocery store and less careful than they otherwise might be. Although consumers may have been impatient when answering the questions Dr. Jacoby designed, the isolation in the interviewing area entails that consumers would feel less confusion and rush in the interviewing area than they would in a grocery store. To an extent, isolation was essential for Dr. Jacoby's study and any researcher would have to face the same problem. Therefore, this shortcoming may be unavoidable. Nevertheless, this factor limits the probative value of the Jacoby study to a small degree.

After considering the plaintiff's arguments concerning the study, the Court finds that Dr. Jacoby's study is somewhat probative, in spite of small flaws. The Court finds that the results of the study are likely to be accurate, since the Court concludes that no likelihood of confusion exists, even aside from a consideration of the study. Nevertheless, the Court does not place great weight on Dr. Jacoby's study. This study cannot by itself be dispositive proof that confusion is unlikely. Instead, it merely tends to show that consumers are not now confused, only one factor to be considered in assessing the likelihood of confusion.

In any case, the Court concludes that the record contains no evidence of actual confusion. Given that it may be too early for such evidence to be available, the Court does not find this factor to be material to the analysis of the eight factors measuring the likelihood of confusion. Therefore, the Court finds, on the current record, that the actual confusion factor neither increases nor decreases the likelihood of confusion.

5. The Marketing Channels Used

■ Worthington also states that the products of both parties reach the consumer through the same marketing channels. Retail grocery stores sell Morningstar Farms food and Kellogg's cereal. The same newspapers and magazines could carry advertisements for both Worthington and Kellogg. The plaintiff states that the methods of advertising the parties' products are identical except for Worthington's use of radio and Kellogg's purchase of television time.

The defendant admits that both products appear in the grocery stores, but argues that they are in unrelated parts of the store. Moreover, Kellogg employs persons to sell its products directly to retail chains while Worthington sells its products only through brokers. Therefore, Kellogg does not confuse brokers when selling its goods.

**84.** As a practical matter, the group of consumers which purchases ready-to-eat cereals encompasses all consumers. Ready-to-eat cereals "are probably in about 93 percent of American households." Transcript at II–19 (testimony of William Weintraub). By contrast, vegetarians number only six million in the United States. See supra text accompanying note 4.

The plaintiff responds that advertisements for Worthington's products appear in the dry goods section along with Kellogg's cereal. Specifically, Worthington has placed "neck hanger" cardboard overlays on the top of bottles of Puritan Oil. *See supra* text accompanying note 31. Therefore, consumers shopping in the dry goods section could see both parties' marks.

The Court finds that the appearance of both Worthington and Kellogg foods in grocery stores theoretically tends to increase to some extent the likelihood of confusion, even when the products are not competing.[85] The physical proximity of the goods means that a consumer might see the defendant's goods soon after the plaintiff's and would have less time to forget the plaintiff's mark.[86] Nevertheless, trademark law does not include a rule that all products sold "under the same roof" with similar marks will engender confusion as to source, connection, or sponsorship. *Id.* at 186–87. Consumers know that modern grocery stores sell a plethora of unrelated goods, including food, toys, clothing, automotive accessories, and so on. Thus, modern consumers would be less likely than their counterparts in previous decades to infer a connection between goods with the same mark, merely from the fact that they appear together in a grocery store.

Furthermore, the Court agrees with the defendant that the parties' products appear in completely unrelated sections of grocery stores. On one hand, Worthington products are in freezer chests or frozen food cases. *See supra* text accompanying note 24. Kellogg products, on the other hand, appear in an aisle set aside for ready-to-eat cereals. *See supra* text accompanying note 55. The separate presentation of the parties' goods almost entirely eliminates any confusion which might arise from the appearance of the parties' foods in the same store. Therefore, although the fact that both parties sell their goods in grocery stores increases the likelihood of confusion, the increase is very small.

The differences in the advertising practices of the parties is also relevant. *Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 572 (6th Cir.1987). In *Little Caesar*, the court found differences in marketing channels because the larger plaintiff company "has a sophisticated advertising program that includes the use of television and that benefits, presumably, from the large number of Little Caesar outlets." *Id.* The defendant's company, on the other hand, "is a small local business with few outlets and a far less sophisticated advertising program." *Id.*

Here, the Court finds that the advertising practices of the two parties differ to a significant degree. The Court finds that Kellogg, like the plaintiff in *Little Caesar*, has a sophisticated advertising program, including television commercials, that benefits from nationwide distribution of its cereals. *See supra* text accompanying notes 57–61. Worthington, on the other hand, is a far smaller firm with a somewhat less sophisticated advertising program. *See supra* text accompanying notes 25–38.

This argument is of limited force, though, since the Court agrees with Worthington that both parties use magazine and newspaper advertisements. Nevertheless, the considerable disparity in advertising budgets indicates that Kellogg's advertising campaign is much larger. This difference in degree and Kellogg's exclusive use of the television medium tend to reduce to some extent the likelihood of confusion arising from similar marketing channels.

The Court also agrees with Kellogg that its use of a direct sales force eliminates the possibility that brokers would be confused as to the source, sponsorship, connection, or affiliation of the parties' products. Brokers simply do not purchase Kellogg products. This argument too, though, is of only limited force. Both products' marketing channels reach the consuming public; this is not a case where professional purchasers process or relabel manufacturers' goods, such that confusion might be possi-

---

85. 2 J. McCarthy, *supra* note 62, § 24:6, at 186.

86. That is, confusion is greater when both parties sell their goods in grocery stores than when one sells products in a supermarket and the other at a place like an auto parts store.

ble in the middle of the distribution chain, but not at the consumer level. Here, both parties' goods reach the consumers in their original form and packaging; confusion is theoretically possible both at a broker level and at the consumer level. The potential for confusion within the consuming public, however, dwarfs the potential for any confusion at the broker level. Therefore, the Court considers the lack of any confusion at the broker level to be only a minor factor weighing against a likelihood of confusion.

In conclusion, the Court finds that the marketing channels factor somewhat lowers the possibility of confusion. Although both products appear in grocery stores enhancing the likelihood slightly, confusion is nevertheless unlikely to stem from this factor because the products appear in different places in the grocery stores. Moreover, the advertising campaigns and methods of selling the products to the retail chains are dissimilar.

### 6. The Likely Degree of Purchaser Care

The normal consumer is the "reasonably prudent buyer." *Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 (6th Cir.1987).[87] Such consumers are not necessarily "very cautious" or experts, but they are also not "indifferent" or "careless." 2 J. McCarthy, *supra*, note 62, § 23:27, at 125. Instead, they are those consumers of "reasonable intelligence and discrimination." *Id.* at 126 (footnote omitted).

Certain factors peculiar to a product market, however, may increase or decrease the degree of caution used by a reasonably prudent buyer; these factors are relevant in determining the likelihood of confusion. Regarding an inexpensive item, for instance, a consumer would be less careful in making a purchasing choice than if the item were expensive. A reasonable person would make a much more careful inquiry before purchasing an expensive item. *Id.* at 130.

■■■■ The standard of care may also vary with the type of consumer purchasing

the products. *Id.* at 132. That is, if children constitute the primary market for a good, for instance, the standard of care would be lower and confusion more likely than if the potential purchasers were adults. *Id.* By contrast, if makers of the product sell to experts or professional buyers, confusion is less likely. Of course, if the market consists of both professional buyers and consumers then the issue will center on the consumers, for confusion within the lowest stratum of "reasonably prudent buyers" may give rise to liability even if professional buyers in the market are not confused. *Id.* § 23:29, at 133–34.

■■■■ Here, the plaintiff argues that consumers would exercise little care in buying its and Kellogg's products. Consumers face a great deal of visual clutter and other sorts of distractions in grocery stores. Accordingly, even normally careful consumers may not be able to differentiate between the two companies' products.

Interestingly, the text of Worthington's literature undermines its argument that purchasers of the parties' products exercise a low degree of care. The plaintiff notes that those who purchase its products are well-educated, health-conscious consumers.[88] Indeed, the plaintiff claims that the parties' products compete because such health-conscious consumers seek out arguably healthy foods, including Morningstar Farms foods and Heartwise cereal. This heightened awareness of health and healthy foods raises the standard of care which the reasonable purchaser of the parties' products would exercise. The defendant raises this very argument, noting that purchasers of the parties' foods are fairly sophisticated consumers and should be able to tell the difference between the products.

The Court agrees with the plaintiff that the products of Worthington and Kellogg are relatively inexpensive. This modest cost adds to the likelihood of confusion. Nevertheless, the relative sophistication of the relevant market for the parties' products offsets this factor to a large extent. Therefore, the Court finds that the likely

---

**87.** *See* 2 J. McCarthy, *supra* note 62, § 23:27, at 124–29.

**88.** *See supra* notes 3–4 and accompanying text.

degree of purchaser care factor only slightly adds to the possibility of confusion.

## 7. The Defendant's Intent

The intent to appropriate another company's goodwill associated with a trademark or control over a mark is "comparable to an expression of opinion by an expert witness." *Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 572 (6th Cir. 1987). That is, "a defendant who purposely chooses a particular mark because it is similar to that of a senior user is saying, in effect, that he thinks there is at least a possibility that he can divert some business from the senior user." *Id.* Such intent is probative on the confusion issue because "the defendant ought to know at least as much about the likelihood of confusion as the trier of fact." *Id.*

The plaintiff has no direct evidence that the defendant intended to infringe upon the plaintiff's mark. Nonetheless, the plaintiff's position is that circumstantial evidence shows intent. The fact that Kellogg had an opportunity to choose a host of names, but chose this one is some evidence of an intent to trade on Worthington's good will. Worthington argues that a person is presumed to intend the consequences of his acts. The Court assumes the plaintiff is arguing that the defendant's choice of Heartwise gives rise to the inference that Kellogg intended to choose the name Worthington was using, despite a myriad of alternatives, with the specific intent to appropriate for itself the goodwill Worthington had built up in the HEARTWISE mark.

The defendant rebuts this argument by noting that the plaintiff attempted to register their HEARTWISE name and heart-shaped logo under the name "Heart Wise and Design" but had abandoned the attempt. Kellogg was unaware that Worthington was placing the mark on a significant number of its packages. Given that it did not know of Worthington's use of HEARTWISE, Kellogg argues that it acted in good faith in using the name. Moreover, its prominent use of its Kellogg's house mark shows that it attempted to clarify the

source of the cereal and preclude any possible confusion.

██ The Court finds unpersuasive the plaintiff's argument that it may presume Kellogg's intent to trade on Worthington's goodwill. The intent factor is relevant because a specific intent to use a mark due to its similarity to a senior user's reflects the junior user's subjective belief that confusion is likely and that the junior user can thereby divert some business from the senior user. *Id.* Here, the Court only has evidence that the defendant intentionally chose the name "Heartwise." That is, the choice of name was not an accident or mistake.

The plaintiff has no evidence, however, that the defendant had the specific intent to choose a mark similar to Worthington's and trade on its goodwill. The Court cannot, as the plaintiff would have it do, presume such a specific intent merely because confusion and diversion of business may be a consequence of the choice of the Heartwise name. Without its effect as evidence of a subjective belief of the defendant that confusion is likely and diversion of business is possible, the intent factor is not relevant. Any presumed specific intent to trade on Worthington's goodwill would not entail such a subjective belief. Accordingly, the Court declines to find an intent to create a mark similar to Worthington's and divert its business simply from Kellogg's choice of the Heartwise name. Before weighing the intent factor in favor of a finding of likely confusion, the Court requires more evidence, such as statements or conduct, which would indicate directly or indirectly a specific intent to choose a mark similar to the plaintiffs with a belief that it will divert business.

██ In any event, the Court finds credible the defendant's contention and testimonial evidence that it was unaware of Worthington's significant usage of the HEARTWISE mark.[89] The defendant's good intentions, however, do not preclude a finding of a likelihood of confusion; intent to copy is not a requirement of a Lanham Act action.

**89.** *See supra* text accompanying notes 49–52.

*Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1189 (6th Cir.1988); *Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc.,* 670 F.2d 642, 647 (6th Cir.1982). Intention is relevant when the plaintiff establishes that the defendant used a certain mark with the knowledge that it had copied the plaintiff's trademark, but if the plaintiff cannot show such intent, the intent factor does not count against the plaintiff; good intentions are irrelevant. *Wynn,* 839 F.2d at 1189; *Frisch's,* 670 F.2d at 647, 648–49.

In short, the Court finds absolutely no evidence which tends to show that Kellogg intended to copy the plaintiff's mark. Instead, the Court finds that Kellogg did not intend to copy Worthington's mark. Therefore, the intention factor is irrelevant in the calculus of the likelihood of confusion.

8. Likelihood of Expansion of the Product Lines

■■■ The final factor to be considered in assessing the likelihood of confusion is the possibility of an expansion in the parties' product lines. Worthington contends that each party might expand its line of food products to include items which would compete directly with new or existing products of the other. Worthington might make a HEARTWISE breakfast cereal, for instance, having signed a letter of intent to purchase a health food company which markets a ready-to-eat cereal product.[90] Worthington mentioned that two ready-to-eat cereal makers considered merging with it at one time, namely Ralston Purina and Quaker Oats. Worthington also contends that Kellogg could start making breakfast meat-substitute products, egg-substitute foods, and so on. The defendant already sells frozen Eggo waffles, a product sold side-by-side with Morningstar Farms goods. The defendant, however, contends that Worthington's possibility of selling a cereal is sheer speculation. Moreover, Kellogg asserts that it has no plan to enter the meat- and egg-substitute market.

It is true that Worthington's use of the HEARTWISE mark on a variety of frozen food products and on packages of Scramblers would lead a consumer to believe that Worthington would be the source of any new, different types of products bearing the HEARTWISE mark which appear on the market. 2 J. McCarthy, *supra* note 62, § 24:8, at 194. Accordingly, if Worthington began to sell a HEARTWISE cereal, consumers might be confused as to its source and the source of Kellogg's Heartwise cereal. Nevertheless, the line expansion argument cannot extend to its "ultimate extreme," which is that "a prior user of a mark would be entitled to prevent use or registration of that mark for almost any and all products found under the roof of any retail store, no matter how unrelated the goods are." *Id.*

In this case, though, the Court finds the possibility of Worthington's expansion into the ready-to-eat cereal market to be speculative at this time. Although Worthington claims it will be purchasing a company making a ready-to-eat cereal named "Ruskets,"[91] it has not come forward with a signed purchase agreement. Moreover, it has not expressed an intention or mentioned a plan to use the HEARTWISE mark on Ruskets Packages. Certainly, Worthington may be able to submit more evidence concerning its line expansion in discovery. On the present state of the record, though, the Court gives little credence to the possibility that Worthington will begin selling a ready-to-eat cereal bearing the HEARTWISE mark.

Moreover, the record contains no evidence that Kellogg will begin producing frozen foods that compete with Worthington's products. Although Kellogg sells Eggo frozen waffles, it does not plan to manufacture meat analog products or an egg substitute. Therefore, Kellogg's expansion plans will not invade the plaintiff's line of goods.

Given the lack of firm evidence in the current record of Worthington's line expansion into the ready-to-eat cereal market, the Court finds it unlikely that the parties will produce competing Heartwise cereals. Moreover, the Court finds that Kellogg will not enter the meat analog market, resulting in competing HEARTWISE meat ana-

**90.** *See supra* text accompanying note 40.

**91.** *See supra* text accompanying note 40.

logs. Therefore, the line expansion argument militates against a finding of a likelihood of confusion.

### 9. Direct Competition and Concluding Remarks

■ To recapitulate, in order to show a likelihood of success on a palming off action, Worthington must show that the sale of the parties' products causes a likelihood of confusion and that the parties' goods compete directly. As for consumer confusion, an analysis of the eight factors relevant to the issue suggest that consumer confusion is extremely unlikely.

The Court found that the similarity of the marks and the likely degree of purchaser care enhance slightly the likelihood of confusion. *See supra* text accompanying notes 78–80, 87–88. Other considerations regarding the similarity of the mark and the degree of purchaser care, however, undercut almost completely any enhancement of the possibility of confusion engendered by these factors. Therefore, although these two factors increase the likelihood of confusion, such an increase, even aside from the confusion-lessening effect of other factors, is not great enough to warrant a conclusion that consumer confusion is *likely*.

Moreover, the Court found that a number of factors reduce the likelihood of confusion, the lack of competition between the goods, separate marketing channels, and the lack of evidence concerning the expansion of product lines. *See supra* text accompanying notes 74–77, 85–86, 90–91. The strength of the mark factor, the actual confusion factor, and the intent factor do not weigh in favor of finding confusion to be likely, but they also do not weigh against such an inference. *See supra* text accompanying notes 71–73, 81–84, 89. In short, the Court finds the possibility of confusion to be extremely remote. Therefore, the Court concludes that Worthington does not meet the first prerequisite for

likelihood of success on the merits of its palming off action, a demonstration of a likelihood of confusion.

Even if Worthington had shown a likelihood of confusion, it cannot prevail under the palming off theory. The second prerequisite for likelihood of success is a demonstration that the parties' goods compete directly. The Court found that Worthington's meat analog products do not compete directly with Kellogg's cereal.

Again, directly competing products are those which are in the same "relevant market" as the courts use the term in analyzing section 2 of the Sherman Act. 15 U.S.C. § 2 (1982). In this case, the Court found that the plaintiff's food had a different function or use than the defendant's cereal. The parties conduct themselves under the assumption that ready-to-eat cereals and meat analogs are in separate relevant markets. Finally, Worthington's products appeal to distinct customers. *See supra* text accompanying notes 75–77. Thus, the plaintiff cannot meet the second prerequisite for a palming off theory, direct competition. Accordingly, the Court concludes that Worthington has no likelihood of success on the merits of its palming off action.

### C. Related Goods Doctrine

■ Although the plaintiff's cannot prevail under its palming off theory, another theory of infringement may provide the plaintiff grounds for relief, the related goods doctrine. A plaintiff can prevail under the related goods doctrine if it can show that the defendant caused consumer confusion about the sources of the goods, in connection with the sale of non-competing, but related products. Unlike palming off, the goods do not compete directly. The products are, however, related enough that consumers may infer that the products came from the same source. *See* J. McCarthy, *supra* note 62, § 24:3, at 164, § 24:6, at 182–83.[92]

---

**92.** Professor McCarthy states that the related goods doctrine encompasses confusion of sponsorship, affiliation, and connection as well as confusion of source for related goods. *Id.* at 182–83. The Court, however, distinguishes between the liability arising from confusion of

source among related goods and confusion of sponsorship arising due to the related nature of the goods. The Court places the liability as to source of related goods under the rubric of the related goods doctrine. Confusion of sponsorship, affiliation, and connection arising due to

The protection of the trademark laws is not limited to directly competing goods or goods with the same descriptive properties, but instead extends to any goods which are likely to cause confusion in the minds of consumers. *See Hindu Incense v. Meadows,* 692 F.2d 1048, 1050, 1051 (6th Cir. 1982). Related goods in certain cases may cause confusion as to source just as directly competing goods can. *See id* at 1051 (enjoining candle seller from using incense seller's trademark; goods did not compete directly, but were related and confusion was likely). Using an identical trademark on related goods enables a defendant to take advantage of the plaintiff's investment in the trademark.

 The Court of Appeals for the Sixth Circuit recognized this theory in a case under section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1) (1982). *Hindu Incense,* 692 F.2d at 1050–51. Given the similarity between section 43(a) trademark infringement actions and section 32(1) actions, the Court concludes that this theory is available to plaintiffs asserting claims under section 43(a). Also, the Court holds that the related goods doctrine is available to plaintiffs proceeding under the Ohio Deceptive Trade Practices Act; the Act defines the concept of "deceptive trade practice" to encompass conduct which causes a "likelihood of confusion or misunderstanding as to the source ... of goods or services." Ohio Rev.Code Ann. § 4165.02(B) (Anderson 1980). Finally, given that the common law provides a remedy for confusion of source and the similarity between federal and state statutory trademark actions, the Court concludes that the Ohio courts would recognize a claim under the related goods doctrine.

In order to show a likelihood of success under the related goods doctrine, Worthington must show that the sale of the parties' products causes a likelihood of confusion and that the parties' goods are related. The Court's previous analysis of the eight factors relevant to likelihood of confusion is applicable here. The Court found that the similarity of the marks and the

likely degree of purchaser care increase slightly the possibility of confusion. *See supra* text accompanying notes 78–80, 87–88. The Court concludes, however, that such an increase is insufficient to raise the inference that consumer confusion is likely.

Moreover, the Court found that the separate marketing channels and the dearth of evidence concerning the expansion of product lines militate against an inference of likely confusion. *See supra* text accompanying notes 85–86, 90–91. The actual confusion factor and the intent factor are not material in this case. *See supra* text accompanying notes 81–84, 89. The plaintiff's mark is of intermediate strength in this case, and therefore neither supports nor undercuts an inference of likely confusion. *See supra* text accompanying notes 71–73.

The remaining factor, the relatedness of the goods, requires a different analysis under the related goods doctrine than it does under the palming off theory. In a palming off action, the plaintiff must show direct competition of the parties' goods. This requirement is relaxed under the related goods doctrine, including the analysis of the likelihood of confusion. The plaintiff need not show direct competition to demonstrate a likelihood of confusion of the type which occurs in related goods doctrine cases.

Here, the plaintiff does claim that the parties' foods are related. Even if the foods do not compete directly, they nonetheless may share a related function. Indeed, the goods may be related in the sense that they are complementary; in other words, consumers could use them both in the same meal. The defendant, however, contends that meat analog products of the plaintiff are so distinct from the defendant's cereal that confusion is unlikely.

The fact that goods bearing the same marks are complementary may indeed give rise to consumer confusion. 2 J. McCarthy, *supra* note 62, § 24:6, at 186. The use of a similar mark on complementary goods

the related nature of the goods are specific instances of what the Court has referred to as confusion of sponsorship. Accordingly, the

Court divides the "related goods doctrine" to which McCarthy refers into two narrower categories of infringement.

may lead buyers to confuse the sources of such goods. Nevertheless, the more that the parties' goods are differentiated, the less likely it is that consumer confusion would result. *See id.* at 189.

In this case, Worthington's products are substitutes for meat. Moreover, consumers bake or microwave such goods and eat them hot. Kellogg's cereal, by contrast, consists of crunchy flakes or nuggets and is presented cold under a blanket of milk. Therefore, they are not complementary or related in the sense of being used together to produce one dish or item. An example of this sort of complementariness would be the relationship between pancake flour and syrup. *See Aunt Jemima Mills Co. v. Rigney & Co.,* 159 C.C.A. 461, 247 F. 407 (2d Cir.1917), *cert. denied,* 245 U.S. 672, 38 S.Ct. 222, 62 L.Ed. 540 (1918), *cited with approval in Hindu Incense v. Meadows,* 692 F.2d 1048, 1051 n. 1 (6th Cir.1982).

■■ Moreover, the Court rejects the rule that any foods which could be used together in the same meal are *ipso facto* complementary or related. Such a principle is too broad. For example, orange juice and cereal are not related, but could appear in the same meal. Of course, this factor is also not irrelevant. The ability for a consumer to see both parties' products at the same meal is one factor which may cause confusion.

■■ Given the differences in function of the parties' products, as well as the peculiar characteristics of Morningstar Farms food, however, the Court concludes that the products are not related enough to cause confusion as to the source of the goods. *See supra* text accompanying notes 74–77. The Court does not find in this case that their appearance at the same meal would make them related in the minds of consumers. Therefore, this factor again militates against a finding that consumer confusion is likely. Accordingly, the Court finds that an analysis of the eight factors relevant to the probability of confusion suggests that the possibility of confusion under the related goods doctrine is extremely remote. Worthington, then, has failed to establish the first element of an action under the related goods doctrine, a likelihood of confusion.

Also, given the Court's analysis in this section of the relation between the goods, the Court finds that Worthington's food and Kellogg's cereal are not "related" within the meaning of the related goods doctrine. Worthington, then, cannot satisfy the second requirement of an action under this theory. Given that Worthington failed to meet both requirements of a claim under the related goods doctrine, the Court concludes that the plaintiff has not shown a likelihood of success under the related goods doctrine.

### D. *Confusion of Sponsorship*

■■ The third theory of infringement which the plaintiff asserts is confusion of sponsorship. Liability is appropriate in a confusion of sponsorship action, if the defendant attempted to cause consumer confusion by the sale of unrelated products. Unlike the palming off theory and the related goods doctrine, the goods are unrelated enough such that consumers do not infer that the products came from the same source. Instead, confusion of sponsorship takes place when the use of similar marks results in a belief among consumers that the plaintiff sponsored the defendant's goods or, more generally, that a connection or affiliation exists between the sources of the goods. In this way, a defendant might be able to capitalize on the goodwill and reputation established by the plaintiff. *Ameritech, Inc. v. American Information Technologies Corp.,* 811 F.2d 960, 964 (6th Cir.1987).

Section 43(a) of the Lanham Act imposes liability for confusion of sponsorship. The statute applies to the use of trademarks which causes confusion "as to the affiliation, connection, or sponsorship" of goods. 15 U.S.C.A. § 1125(a) (West Supp. 1989). Moreover, the use of a trademark which engenders confusion of sponsorship is a "false designation of origin." *Id.* The Ohio Deceptive Trade Practices Act also extends liability to the generation of confusion of sponsorship. The Act encompasses those who cause confusion as to "affiliation, connection, or association with, or certification by, another." Ohio Rev.Code Ann. § 4165.02(C) (Anderson 1980). It also

forbids persons from making representations that their "goods or services have sponsorship [or] approval ... that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have." *Id.* § 4165.02(E). Finally, confusion of sponsorship is actionable under Ohio common law. *Ameritech,* 811 F.2d at 964.

■ The plaintiff must satisfy two requirements in order to show a likelihood of success on its confusion of sponsorship claim. First, it must demonstrate a likelihood of confusion as to sponsorship, affiliation, or connection of the parties' goods. Second, it must show that the parties' goods are related to an extent which could permit confusion of sponsorship, affiliation, or connection to arise. The Court will address each requirement in turn.

■ Again, the eight factors which determine the level of consumer confusion are relevant here for assessing the likelihood of confusion as to sponsorship, affiliation, or connection. *Id.* at 966 (eight factors relevant to reverse confusion and dilution claims). The Court notes at the outset that the relatedness of the goods factor requires a different analysis under the confusion of sponsorship theory than it does under the palming off theory or the related goods doctrine. In a palming off action, the parties' goods must be in direct competition. Under the related goods doctrine, this requirement is relaxed, but the goods must be related to the extent consumers are confused as to the sources of the goods. In a confusion of sponsorship case, the relatedness requirement is even further relaxed. The goods merely must be such that confusion as to affiliation, connection, or sponsorship is possible; of course, the greater the extent of the relatedness, the greater is the likelihood of confusion.

If goods are so unrelated as to make confusion as to source unlikely, though, a plaintiff must almost completely depend on factors other than the relatedness of the goods to show a likelihood of confusion. That is, at the low level of relatedness where goods are neither directly competing nor "related" within the meaning of the related goods doctrine, the other seven factors must "bear the brunt" of the plaintiff's effort to support an inference of likely confusion.

■ In this case, the Court finds that the parties' goods meet the threshold requirement of "relatedness" necessary for confusion of sponsorship, affiliation, or connection to be possible. As Worthington notes, both parties' products are inexpensive breakfast foods. As a theoretical matter, then, assuming the plaintiff's HEARTWISE line of meat analog breakfast food were famous and Kellogg began selling a HEARTWISE cereal, consumers might believe that Worthington had expanded its line of goods to encompass ready-to-eat cereal and thereby think Worthington had sponsored this new cereal. This relatedness factor, then, increases the likelihood of confusion of sponsorship.

This minimal relationship between the parties' goods adds little to the probability of confusion, though. Moreover, Worthington has not made a strong enough showing on the factors other than the relatedness of the goods to demonstrate that confusion sponsorship is likely. The only factors which support an inference of confusion, the prima facie argument concerning the similarity of the marks, the minimal relatedness of the goods, and the relatively low degree of purchaser care, are not sufficient to justify a conclusion that confusion is likely. *See supra* text accompanying notes 78–80, 87–88.

Furthermore, the separate marketing channels and lack of evidence of line expansion tend to reduce possible confusion. *See supra* text accompanying notes 85–86, 90–91. The strength of the mark factor, actual confusion factor, and the intent factor again neither increase nor decrease the likelihood of confusion in this case. *See supra* text accompanying notes 71–73, 81–84, 89. Therefore, even if the parties' goods were related to the minimal extent necessary to make confusion of sponsorship possible, the other factors relevant to confusion indicate only a very small possibility of confusion. Accordingly, the Court finds that the plaintiff has not shown a likelihood of confusion under the confusion of sponsorship claim.

The second requirement which the plaintiff must meet in order to show likely success on the merits of its confusion of sponsorship claim is that the parties' goods must be related to a minimal extent necessary for confusion of sponsorship, affiliation, or connection to be possible. Here, the plaintiff has met this requirement. The parties' foods have a small degree of relatedness. If Worthington had shown a likelihood of confusion of sponsorship, it would have shown that liability is likely.

Nevertheless, the Court concludes that Worthington has not shown a likelihood of success on the merits of its action under the confusion of sponsorship theory. Although the plaintiff can show that the goods meet the minimal standard of relatedness necessary to support liability, the plaintiff cannot demonstrate a likelihood of confusion.

### E. Reverse Confusion of Sponsorship

■ The fourth theory of infringement under which Worthington can proceed is the reverse confusion of sponsorship theory. In a reverse confusion of sponsorship suit, the plaintiff's action rests on the claim that the junior user of a mark is saturating the market with advertising bearing the mark, thereby causing consumer confusion. Specifically, consumers mistakenly believe that the senior user's products are the junior user's or that the senior user is somehow connected with the junior user. *Ameritech, Inc. v. American Information Technologies Corp.*, 811 F.2d 960, 964–65 (6th Cir.1987). The evil in this kind of confusion is that the "senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets." *Ameritech*, 811 F.2d at 964.

■ Section 43(a) of the Lanham Act contemplates liability under the reverse confusion of sponsorship theory. The statute encompasses the utilization of trademarks which causes confusion "as to the affiliation, connection, or sponsorship" of goods. Since the statute is not limited by its plain language to situations where consumers believe the plaintiff sponsored the defendant's goods, the Court holds that this language imposes liability on defendants who create in consumers' minds the mistaken belief that the defendant sponsored the plaintiff's goods. In other words, the Court holds that claims of both confusion of sponsorship and reverse confusion of sponsorship are actionable under section 43(a) of the Lanham Act.[93]

Similarly, the Ohio Deceptive Trade Practices Act provides a basis for liability under the reverse confusion of sponsorship theory. Like the Lanham Act, it imposes liability on parties which cause confusion of sponsorship, without limiting such liability to cases where consumers believe that the plaintiff sponsored the defendant's goods. The Act defines "deceptive trade practice" to include causing confusion as to "affiliation, connection, or association with, or certification by, another." Ohio Rev.Code Ann. § 4165.02(C) (Anderson 1980). The Ohio courts would also recognize a reverse confusion of sponsorship action under the common law of Ohio. *Ameritech*, 811 F.2d at 964–65.

■ The plaintiff must meet two requirements in order to demonstrate a likelihood of success on its reverse confusion of sponsorship claim. First, Worthington must show a likelihood of confusion consisting of the belief that the defendant sponsored the plaintiff's goods or that such goods are connected or associated with the defendant. Second, the plaintiff must demonstrate that the goods of the plaintiff and defendant are related to an extent which could permit confusion of sponsorship, affiliation, or connection to arise. The Court

---

**93.** In *Love v. New York Times Co.*, 691 F.2d 261 (6th Cir.1982), the plaintiff publisher produced a magazine entitled *US Quarterly* or *US*. He sued the New York Times Company for its publication and mass dissemination of *Us* magazine. The court recognized that the plaintiff had a theoretical viable reverse confusion claim; the flood of *Us* magazines might place the plaintiff "in the position of appearing to be trading on the name chosen by the later or junior user," the New York Times Company. *Id.* at 264. *Love* provides additional support for the proposition that reverse confusion of sponsorship is actionable under section 43(a).

will consider each of these requirements in turn.

Again, the eight factors appropriate to an analysis of a likelihood of confusion are relevant. *Ameritech,* 811 F.2d at 966. Like a confusion of sponsorship action, the plaintiff need not show a close relationship between the parties' goods. Slightly different, though, is the analysis of the strength of the plaintiff's mark. The inherent nature of the plaintiff's mark is relevant since the more distinctive the mark, the more likely it is that a consumer, with a general recollection of the plaintiff's mark, will draw a connection between the two parties when seeing the defendant's mark. Yet the actual performance of the plaintiff's mark in the market place is relevant in a different way than it would be under the other theories.

A plaintiff asserting this theory is not arguing that its mark is overwhelming or will be so well-known in the marketplace that the defendant's use of that mark causes consumers to believe it sponsored the defendant's goods. Instead, the plaintiff must show that the defendant's mark has captured greater consumer recognition than its own, that the defendant's mark is overwhelming or will overwhelm the plaintiff's mark. That is, the plaintiff is arguing that consumers are confused when they see the defendant's mark because they then associate the plaintiff's product with the defendant.

In this case, the plaintiff contends that Kellogg's use of the Heartwise mark will lead consumers to believe that Kellogg makes or sponsors Morningstar Farms products. Its enormous advertising campaign will place Kellogg's mark in consumers' minds. Consumers will believe that Worthington's products have some connection or affiliation with Kellogg because Worthington and Kellogg use identical marks. The defendant counters that its advertising campaign, if it has any effect on the plaintiff's products at all, may in fact enhance Worthington's sales. Thus, Worthington will sustain no damage from Kellogg's decision to sell Heartwise cereal.

After considering the evidence presented, the Court finds that there is no likelihood of confusion between the parties' goods under an analysis of the eight relevant factors. An analysis of the first factor, the strength of the mark, leads the Court to the conclusion that even under the modified standard under the reverse confusion of sponsorship theory, the factor does not weigh in favor or a finding of a likelihood of confusion. The Court again notes that the mark is not, by its inherent nature, a "strong" mark; it is neither fanciful nor arbitrary. *See supra* text accompanying notes 71–72. The Court also does not find that the defendant's mark is, at this early date, overwhelming the plaintiff's mark. Kellogg's product has been on the market such a short time that it is not yet a household name. The Court, however, does not foreclose the possibility that the effect of the defendant's much larger advertising budget will be to overwhelm the plaintiff's mark over the long run.

Even if the defendant does overwhelm the plaintiff's mark in its consumer recognition, though, the other factors relevant to consumer confusion are insufficient to raise an inference of a likelihood of confusion. Only three other factors tend to increase the likelihood of confusion, the relatedness of the goods, the similarity of the marks, and the relatively low degree of purchaser care. *See supra* text accompanying notes 78–80, 87–88. Similar to the Court's conclusion in the previous section, the Court finds that the parties' goods are related to the minimal extent necessary to make reverse confusion of sponsorship possible. The increase in the likelihood of confusion stemming from these three factors, however, is so slight that they do not make confusion a likelihood, even if Kellogg's mark overwhelmed Worthington's.

Moreover, the other four factors either decrease the likelihood of confusion or are neutral in their effect. The separate marketing channels and the lack of evidence regarding line expansion reduce the likelihood of confusion. *See supra* text accompanying notes 85–86, 90–91. The actual confusion factor and the intent factor neither increase nor decrease the likelihood of confusion. *See supra* text accompanying

notes 81–84, 89. Therefore, the Court concludes that Worthington has not shown a likelihood of confusion under the reverse confusion of sponsorship theory.

The second requirement which the plaintiff must meet in order to show a likelihood of success under the reverse confusion of a sponsorship theory is that the parties' goods must be related enough such that reverse confusion of sponsorship is possible. In this case, the parties' goods do meet this requirement. If Worthington had shown a likelihood of confusion, the Court would have concluded that liability would be likely at trial. Worthington failed to make such a showing, though.

In sum, Worthington cannot succeed in showing a likelihood of success on the merits of its reverse confusion of sponsorship claim. Although the plaintiff can show a minimal relationship between the parties' goods which could permit reverse confusion of sponsorship, the plaintiff cannot demonstrate a likelihood of confusion.

### F. *Dilution*

■ A dilution action under Ohio common law is neither based on consumer confusion nor on the competition between the parties' goods. Instead, the crux of a dilution claim is that a junior user's utilization of a distinctive name, word, symbol, or other device gradually corrodes its distinctiveness or effectiveness and thus reduces

its value over the long run, even if it did not cause the senior user to lose sales or control over the mark's reputation in the short run. The junior user's utilization may blur product identification or may damage consumers' positive associations with the senior user's goods. *Ameritech, Inc. v. American Information Technologies Corp.*, 811 F.2d 960, 965 (6th Cir.1987); 2 J. McCarthy, *supra* note 62, § 24:13, at 212–13.

■ Since dilution involves damage to a mark in the absence of consumer confusion, the Lanham Act cannot support a dilution action; the Lanham Act requires plaintiffs to show consumer confusion. 2 J. McCarthy, *supra* note 62, § 24:13, at 223. The Court concludes that the Ohio Deceptive Trade Practices Act requires a showing of consumer confusion as well, given its similarity to the Lanham Act. Therefore, dilution is not actionable under the federal or Ohio statutes governing trademarks. Nonetheless, the Court of Appeals for the Sixth Circuit has clearly held that Ohio recognizes the dilution doctrine under its common law. *Ameritech*, 811 F.2d at 965 (citing *National City Bank v. National City Window Cleaning Co.*, 180 N.E.2d 20 (Ct.App.1962), *remanded on other grounds*, 174 Ohio St. 510, 190 N.E.2d 437 (1963); *Guild & Landis, Inc. v. Liles & Landis Liquidators, Inc.*, 2 Ohio Misc. 169, 207 N.E.2d 798 (C.P.1959)).[94]

**94.** *Contra Anheuser–Busch, Inc. v. Florists Ass'n, Inc.*, 603 F.Supp. 35, 39–40 (N.D.Ohio 1984). In *Anheuser–Busch,* Judge Aldrich stated:

> Trademark dilution … is exclusively a creature of state statute, and there is no provision in the Lanham Act. Dilution statutes have been enacted in some thirty states, but not in Ohio. Such statutes represent a policy decision by a state to supplement the rights afforded to trademark owners under the federal statute and common law. Where Ohio has not seen fit to enact such legislation, this Court declines to provide such additional protection.

> *Id.*

> Dilution is damage which a mark sustains in spite of a lack of competition between the parties' goods and despite a lack of consumer confusion. *Ameritech,* 811 F.2d at 965. *Ameritech* relied upon four cases adjudicating Ohio common law in support of the proposition that Ohio recognizes the dilution theory. *Id.* (citing *National City Bank v. National City Window Clean-*

*ing Co.,* 174 Ohio St. 510, 513–14, 190 N.E.2d 437, 439 (1963); *Henry Furnace Co. v. Kappelman,* 91 Ohio App. 451, 108 N.E.2d 839 (1952); *Hugo Stein Cloak Co. v. S.B. Stein & Son, Inc.,* 58 Ohio App. 377, 16 N.E.2d 609 (1937); *Guild & Landis,* 2 Ohio Misc. at 169, 207 N.E.2d at 798).

Each case cited by *Ameritech* to support the dilution theory in the Ohio courts, however, entailed liability because consumers would likely be confused. *Ameritech* quotes a segment of *National City Bank,* for instance, that roughly approximates the dilution doctrine, *id.* (quoting *National City Bank,* 174 Ohio St. at 513–14, 190 N.E.2d at 439), but the court does not account for the Ohio Supreme Court's predication of liability on consumer confusion. *National City Bank,* 174 Ohio St. at 514, 190 N.E.2d at 439 ("confusion in identity"). Similarly, the other cases relied on consumer confusion. *Henry,* 91 Ohio App. at 463, 108 N.E.2d at 846 ("customers … will be injured and deceived"); *Hugo Stein,* 58 Ohio App. at 382, 16 N.E.2d at 611 ("appel-

Here, the plaintiff argues that Kellogg's use of "Heartwise" dilutes its interest in the name "HEARTWISE" because of the mass saturation of advertising Kellogg plans to undertake in 1990. Moreover, Worthington claims that the Food and Drug Administration is now investigating the use of the grain "psyllium" in cereals. The plaintiff presumes that this investigation will generate a great deal of negative publicity. Kellogg's Heartwise cereal contains this ingredient. The plaintiff contends that the notoriety stemming from this investigation will hurt Kellogg, and by the association with the defendant, it will damage Worthington as well.

The Court finds the notion that Worthington will be tainted by a psyllium scandal to be sheer speculation. The likelihood of consumers associating Worthington and psyllium is small. Assuming that an investigation takes place and that its findings are adverse towards psyllium, it may not generate much negative publicity. Moreover, even assuming massive negative publicity, consumers are unlikely to associate psyllium with Worthington's foods because the plaintiff's products not only do not contain psyllium but they are also not the kind of goods which Kellogg sells.[95] Consumers are likely to associate psyllium only with ready-to-eat cereals. Thus, the Court finds it highly unlikely that Worthington will sustain any harm from a psyllium investigation.

The Court does, however, find it likely that Kellogg's immense advertising campaign will eventually erode the value of the HEARTWISE mark to the plaintiff to some extent. The campaign will likely reduce the association of the mark with Worthington in the minds of consumers and increase the association with Kellogg. Worthington will likely lose the control over the mark which it previously enjoyed.

Nonetheless, the Court notes that the plaintiff must have a distinct mark in order to succeed on a dilution claim. *Ameritech*, 811 F.2d at 965 (citing *National City Bank v. National City Window Cleaning Co.*, 174 Ohio St. 510, 513–14, 190 N.E.2d 437, 439 (1963)); 2 J. McCarthy, *supra* note 62, § 24:14, at 224–25. National fame is not necessary, though, for a mark that is "strong in a particular geographical or product area also deserves protection." *Ameritech*, 811 F.2d at 965.

In this case, the Court found that the plaintiff's mark is not particularly distinctive. *See supra* text accompanying notes 71–72. The plaintiff's trademark is suggestive, rather than fanciful or arbitrary. Therefore, it is not within the categories traditionally considered to be distinctive. Moreover, the actual performance of the HEARTWISE mark does not demonstrate a particular fame in any geographical area which might compensate for the lack of inherent strength. Accordingly, the plaintiff cannot show a likelihood of success on the merits of its dilution claim even assuming that Kellogg's deluge of advertising would loosen the connection between Worthington and its HEARTWISE mark.[96]

lant is entitled to protection against the use, by another, of its established trade name and trade mark in such manner as to mislead the trade and the public"); *Guild & Landis*, 2 Ohio Misc. at 171, 207 N.E.2d at 800 ("many persons mistook the name 'Liles & Landis' for 'Guild & Landis'"); *id.* at 172, 207 N.E.2d at 800 ("confused and deceived a portion of the public").

Given the findings of consumer confusion in these Ohio cases, it seems more accurate to consider them precedents for the confusion of sponsorship theory. The confusion of sponsorship theory establishes liability for those creating a mistaken impression of a connection, affiliation, or sponsorship relation between the products' sources. *See Ameritech*, 811 F.2d at 964. A plaintiff need not prove direct competition between the goods as long as he can show consumer confusion as to a relationship between the sources. By contrast, the premise of

the dilution theory is not only that the products do not compete, but that "no confusion is possible." *Id.* at 965. Cases in which consumer confusion is likely, therefore, do not directly support the dilution theory.

Nevertheless, this Court is bound by the unambiguous holding of the *Ameritech* court that "[d]ilution claims ... are cognizable under Ohio's common law." *Id.* Thus, the Court hereby analyzes the dilution theory under Ohio common law.

95. *See supra* text accompanying notes 76–77.

96. The Court finds this result desirable. The HEARTWISE name is not distinctive enough to warrant granting the plaintiff the exclusive right to use the name on any food or other good, no matter how unrelated the goods are and in spite of a lack of any possible consumer confusion.

### G. Conclusion as to the Likelihood of Success

The Court holds that the plaintiff cannot show a likelihood of success on the merits of its action asserted under section 43(a) of the Lanham Act, the Ohio Deceptive Trade Practices Act, and Ohio common law. Specifically, Worthington failed to show a likelihood of success under any of the theories of infringement which it asserts, palming off, the related goods doctrine, confusion of sponsorship, reverse confusion of sponsorship, or dilution. The Court found that confusion was unlikely under the palming off theory, the related goods doctrine, the confusion of sponsorship theory, and the reverse confusion of sponsorship theory. Moreover, the parties' goods are not related enough under the palming off theory or the related goods doctrine to warrant liability. Worthington's dilution claim under Ohio common law fails because its trademark is not distinctive.

Although the plaintiff failed to show likelihood of success on the merits, this failure does not "preclude a court from the exercise of its discretion to issue a preliminary injunction." *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1270 (6th Cir.1985). Specifically, if the plaintiff were able to show serious questions going to the merits of the action and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction were issued, then it is within the Court's discretion to issue a preliminary injunction. *Id.*

In this case, however, the Court concludes that the plaintiff cannot even show serious questions going to the merits to make them a fair ground for litigation. An analysis of the various theories of infringement make it clear that Worthington cannot prevail. The factors favoring liability fall far short of raising serious questions on the merits.

### IV. IRREPARABLE INJURY

Aside from questions going to the merits of the suit, Worthington must show irreparable injury in order to merit a preliminary injunction. Regarding the injury Worthington will suffer, the Complaint states merely that consumer confusion will result from Kellogg's use of the HEARTWISE trademark, design, and slogans, and that it will suffer an injury to its business reputation and goodwill. Moreover, its marks will suffer a diminution in value.

The motion for preliminary injunction elaborates the plaintiff's claims. It states that the plaintiff's breakfast foods, specifically substitute eggs, sausage, and so on, compete directly with Kellogg's cereal. Kellogg is beginning to sell Heartwise cereal. The plaintiff argues that consumers will mistakenly believe that Worthington is controlling or sponsoring the cereal's sales. Consumers will purchase Kellogg's cereal instead of the plaintiff's foods. Worthington will lose sales as a result and will lose control over its trademark.

Also, the plaintiff states that the FDA is criticizing Kellogg's Heartwise cereal for its use of the grain, psyllium. Worthington claims that its products will be tainted by the association with Kellogg's cereal. The FDA has been criticizing "health claims" by food manufacturers which are misleading. The plaintiff contends that "public reports" characterize Kellogg's claims concerning Heartwise cereal as being within the FDA's category of misleading health claims. The defendant argues, however, that this claim is only hearsay and speculation. The FDA has only requested information from Kellogg for administrative proceedings. The defendant denied that Worthington would be harmed by FDA criticism, even if it took place.

The plaintiff also argues that irreparable injury is presumed routinely in trademark infringement cases where the plaintiff can show a likelihood of confusion. Worthington notes that it has a great financial stake in the success of its products. A large percentage of its total business stems from Morningstar Farms products and sales have increased. Moreover, Worthington has undertaken a $25 million capital improvement program, and has spent millions in advertising.

The defendant, however, denies that consumer confusion will take place. Accordingly, a presumption of irreparable injury is unwarranted. Furthermore, the defendant notes that Worthington's intense ad-

vertising may advance the Morningstar Farms name and the names of individual products such as "Grillers," but it is not necessarily an investment in the HEART-WISE name. It states, for instance, that the HEARTWISE mark does not even appear on the package of Scramblers egg substitute, Worthington's best-selling and fastest-growing product. The plaintiff's vice president in charge of marketing and sales admitted that as between the Morningstar Farms mark, names of specific products such as "Grillers," and the HEARTWISE mark, the plaintiff needed the HEARTWISE mark the least. *See* Transcript at I–119 to –20 (testimony of Franklin Poston).

Accordingly, the defendant argues, since Worthington uses the mark, not as house mark or the name of an individual product, but simply to convey certain information, the advertising Worthington conducts does not bolster the goodwill associated with HEARTWISE, but instead boosts Morningstar Farms or the names of the individual products such as "Grillers." Moreover, the defendant notes that the small size of the mark, unreadable to all but the most diligent consumer, suggests that any goodwill produced by the plaintiff's advertisements adhere to the house mark or name of the individual product.

■ Also, the defendants cite the plaintiff's failure to pursue registration of a federal trademark in "HEARTWISE" and

the design associated with it.[97] One inference from this failure is that the plaintiff does not consider the mark to be crucial to its sales. The Court could conclude, then, that another's use of that mark would not hurt the plaintiff significantly.

■ The Court agrees with the plaintiff that if it can show a likelihood of success on the trademark claims which entail a finding of consumer confusion, the Court may presume irreparable injury. *Central Benefits Mutual Ins. Co. v. Blue Cross and Blue Shield Ass'n,* 711 F.Supp. 1423, 1434 (S.D.Ohio 1989); *Wendy's Int'l, Inc. v. Big Bite, Inc.,* 576 F.Supp. 816, 824 (S.D.Ohio 1983). Nevertheless, the Lanham Act does not contain a per se rule concerning the connection between consumer confusion and irreparable injury; that is, a showing of a likelihood of confusion does not necessarily entail a finding of irreparable injury mandating an injunction. *National Bd. of YMCA v. Flint YMCA,* 764 F.2d 199, 201 (6th Cir.1985). To merit such a presumption, the plaintiff must also show, for instance, that it has "actively promoted and protected" its trademark, and that it has a "substantial financial stake" in the mark. *Wendy's,* 576 F.Supp. at 824.[98]

■ The Court, however, does not find a likelihood of success on the merits. In fact, it does not even find that the plaintiff has raised serious questions going to the merits of the action. Accordingly, the

**97.** Worthington had submitted an application for registration of the HEARTWISE name and design for its line of foods. When the Patent and Trademark Office ("PTO") responded that Worthington had not specified with sufficient particularity the goods to be associated with the mark, Worthington did not attempt to repair its application. For that reason, the PTO considered the registration "abandoned."

Of course, this "abandonment" has no legal significance as to the rights of Worthington to the protection of the mark, assuming that it used and enforced the mark vigorously. This "abandonment" is not of the same kind as that which occurs when a user fails to use a mark for a long period of time, which may cause the mark to revert to the public domain.

**98.** The defendant argues, however, that *YMCA* does not permit a presumption of irreparable injury unless there is such "a high probability of confusion" that irreparable injury will "almost

inevitably" occur. 764 F.2d at 201. The Court, however, disagrees with Kellogg's argument. *YMCA* quoted an opinion by Judge Friendly for the proposition that if there were a high probability of confusion, irreparable injury would almost inevitably occur. *Id.* (quoting *Omega Importing Corp. v. Petri–Kine Camera Co.,* 451 F.2d 1190, 1195 (2d Cir.1971)). *YMCA* stated that an injunction should not issue, unless a high probability of confusion existed which entailed irreparable injury. *Id.* It does not follow at all that unless the plaintiff can show a high probability of confusion, the Court cannot presume irreparable injury. In other words, a *high* probability of confusion under certain circumstances is a sufficient condition of presumed irreparable injury, but it does not follow that a *high* probability of confusion is a necessary condition of presumed irreparable injury. A plaintiff need only show a *likelihood* of confusion, among other things, to merit a presumption of irreparable injury.

Court finds no irreparable injury which would stem from consumer confusion. Moreover, the Court agrees with the defendant that Worthington's advertisement may have built goodwill in the Morningstar Farms name or the name of individual products, but not necessarily HEARTWISE. The plaintiff presents no survey evidence which might measure the goodwill in HEARTWISE in comparison with the other marks that it uses.

Moreover, the Court agrees with the defendant that the plaintiff's abandonment of its registration application casts doubt on the extent of Worthington's financial stake in the HEARTWISE mark. It is possible to infer that if Worthington thought that it had a great financial stake in the mark, it would have pursued registration more vigorously. Such an inference is weak, however, since the abandonment may have been the result of neglect on the part of Worthington's counsel. Therefore, the Court places little emphasis on this argument.

The Court also gives the plaintiff's psyllium notoriety argument very little credence. The Court finds only a remote likelihood that Worthington would incur any harm from such an investigation. *See supra* text accompanying notes 95. The differences between the types of goods sold by the parties, *see supra* text accompanying notes 76–77, make it highly unlikely that consumers will associate psyllium with the plaintiff's foods.

In short, the plaintiff relies for the most part on the likelihood of success as the basis for a presumption that irreparable injury will occur. Moreover, Worthington emphasizes its great financial stake in the HEARTWISE mark. The Court, however, found no likelihood that confusion will occur. Accordingly, the Court does not presume that irreparable injury will occur.

Moreover, the Court does not find that an FDA investigation of psyllium products will injure Worthington, based on the current state of the record. Therefore, the Court finds that the plaintiff has failed to show irreparable injury.

## V. HARM TO OTHERS

The third factor to consider when assessing a motion for a preliminary injunction is the harm suffered by persons other than the plaintiff. If such harm outweighs the irreparable injury suffered by the plaintiff, then it is within the Court's discretion to deny injunctive relief. The plaintiff must make a stronger showing on the other factors in order to justify an injunction if relief would entail harm to others. "Where the burden of the injunction would weigh as heavily on the defendant as on the plaintiff, the plaintiff must make a showing of at least a 'strong probability of success on the merits' before a trial court would be justified in issuing the order." *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1270 (6th Cir.1985) (citations omitted).

█ In a trademark case, if the movant can show a likelihood of success, then the harm to others caused by an injunction will likely consist in part of the non-movant's lost profits from sales of the apparently infringing articles and a loss of the money expended on promotional materials and advertising. Such harm caused to apparent infringers, however, is not entitled to consideration in assessing the harm caused by an injunction. *See Central Benefits Mutual Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F.Supp. 1423, 1435 (S.D.Ohio 1989).

"A party who willfully proceeds to expend funds on infringing activities cannot claim the loss of those funds as a ground for denying preliminary injunctive relief." *Id.* Of course, courts may have to consider harm to persons other than the infringer,[99]

99. It is possible to conceive of a situation where an injunction would harm persons other than the alleged infringer to an extent which would militate against preliminary relief. If a producer of a medical device, for instance, used the trademark of another company, resulting in consumer confusion, but thousands of ill persons depended on the purchase of the company's devices for day-to-day survival, immediate preliminary relief would bring about death and suffering. In such a case, the "harm to others" factor would weigh strongly against a preliminary injunction, even aside from possible harm to the manufacturer of the allegedly infringing product. This nightmarish scenario, of course, is quite different from this case, where persons do not depend on Kellogg's Heartwise cereal for survival.

but in most cases, only the fortunes of the plaintiff and defendant are at stake. Accordingly, if the plaintiff alleging trademark infringement can show a likelihood of success, the "harm to others" factor of the preliminary injunction standard would normally favor the plaintiff as well.

In this case, Kellogg states that it will lose tens of millions of dollars if the Court enjoins the sale of Heartwise cereal. First, the Heartwise product that exists now is worth approximately $30 million. Transcript at II–45 to –46 (testimony of William Weintraub). Also, Kellogg has spent a great deal on advertisement, product development, and capital equipment production, an amount which it contends totals $15 million. *Id.* at II–40, II–48, II–50 to –51. Kellogg argues that all of these expenditures would be wasted if an injunction were to issue. Furthermore, Kellogg and the grocery stores would lose revenue from the loss of Heartwise cereal sales. The injunction would also damage relations between Kellogg and the companies which purchase its cereal. An injunction would frustrate grocery stores, since the stores could not sell Heartwise cereal. This frustration would lower their desire to purchase the defendant's cereal. Since their demand for Kellogg's cereal would diminish, Kellogg would lose even more income in the future.

Moreover, Kellogg notes that any delay in the ability to sell its cereal may mean the difference between vast success and tremendous failure of the cereal's marketing efforts. Kellogg contends that the first company to market a cereal of a certain kind is usually successful, while other companies which "jump on the bandwagon" with similar products are usually not successful. Transcript at II–38 to –40 (testimony of William Weintraub). In this case, General Mills is beginning to market a psyllium-containing cereal, called "Benefit." Kellogg fears that delay will mean that Benefit will eclipse Heartwise cereal and will mean millions of dollars in lost revenue. *Id.* at II–45, II–50 to –51.

Worthington, however, argues that it has shown a likelihood of success on the merits. Since Kellogg infringed upon the plaintiff's mark, then, the harm to the defendant from the injunction is not entitled to consideration. Therefore, the harm to others factor should weigh in favor of Worthington.

The Court agrees with Kellogg that the injunction would cause it to suffer considerable losses. First, Kellogg would be unable, in the short run, to sell the approximately $30 million worth of cereal that now exists. This would amount to a significant loss of revenues. It might be possible, however, to recall and repack the cereal under a different trademark; therefore, the company may be able to sell the cereal in the long run.[100] Nevertheless, such a recall would be extremely expensive.

Second, the Court agrees with Kellogg that the defendant's commitments for advertising expenditures would also be wasted in the event of an injunction. Although Kellogg has not yet committed its entire advertising budget and could therefore reroute such funds, Kellogg has committed a certain segment of its budget to advertising such that an injunction would result in its forfeiture. This cost now totals $7 million.

Finally, the Court agrees with Kellogg that any delay necessary in repacking the cereal or altering the trademarks would leave the company at a serious marketing disadvantage. Since the first product of a certain type of cereal on the market takes the lion's share of the sales, the departure of Heartwise from the market would seriously injure Kellogg.

Given that Kellogg has shown considerable harm to its interests which an injunction would cause, Worthington would have to show a "strong probability of success on the merits." *Frisch's,* 759 F.2d at 1270. The Court, however, found that Worthington failed to show a likelihood of success on the merits or even serious questions

---

**100.** The plaintiff, though, may be able to secure the destruction of the cereal in the long run if it were to succeed on the merits of the lawsuit. The Lanham Act permits the Court to order that infringing goods be "delivered up and destroyed." 15 U.S.C. § 1118 (1982 & West Supp. 1989).

going to the merits of the suit. Therefore, the Court does consider the harm to Kellogg to be a factor weighing against injunctive relief. In fact, given the considerable harm to Kellogg and the lack of irreparable injury to Worthington, the Court concludes that the balance of hardships tips decidedly toward Kellogg.

## VI. THE PUBLIC INTEREST

The final factor to be considered when assessing the desirability of injunctive relief is the public interest. If an injunction would bring disaster and ruin to the public, for instance, the Court may find that a preliminary injunction would be inappropriate, even if the movant were to show that the other factors weigh in its favor.[101] By contrast, if an injunction would bring about a great public benefit by, for example, enjoining some seriously injurious activity, the public interest would weigh in favor of a preliminary injunction.

■ In a trademark case, public policy concerns may weigh in favor of preliminary injunctive relief because an injunction could halt confusion in the marketplace. If the movant shows a likelihood of success on the merits of an action under the palming off theory, the related goods doctrine, the confusion of sponsorship theory, or the reverse confusion of sponsorship theory, it has thereby shown a likelihood of confusion concerning the source, affiliation, connection, or sponsorship of the goods.[102] Avoiding confusion by issuing an injunction would be in the public interest. *See Central Benefits Mutual Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F.Supp. 1423, 1435 (S.D.Ohio 1989).

Here, Worthington relies upon this argument to contend that the public interest favors injunctive relief. It contends that it has shown a likelihood of success and has shown confusion as to source, affiliation, connection, or sponsorship of the parties' goods. The defendant, however, notes that an injunction would not be in the public interest. It disputes that the plaintiffs can show a likelihood of success on the merits.

Moreover, an injunction would restrain trade, leaving the public without the benefits of its healthy cereal.

The Court found that the plaintiff has not shown a likelihood of confusion, and therefore could not show a likelihood of success on the merits under the theories based on consumer confusion. Therefore, the Court does not find that the injunction would be in the public interest by virtue of its capacity to halt consumer confusion.

■ The Court, however, puts little stock in the argument that an injunction would restrain trade. If the plaintiff were successful in showing that the defendant infringed upon its trademark, then a restraint of trade in the form of an injunction would be justified. Therefore, the argument has little force if the plaintiff can show a likelihood of success. Here, of course, the plaintiff cannot show a likelihood of success on the merits. Thus, the Court concludes that the "restraint of trade" caused by an injunction would be unjustified. Here again, though, the restraint is unjustified because of the operation of the other factors involved in weighing injunctive relief rather than the undesirability of the restraint itself.

Also, the Court does not consider the healthiness of the cereal to be a crucial concern. Certainly, depriving the public of healthy food would be undesirable, but in this case, consumers can eat healthy foods, even if the Court enjoined the sale of Heartwise cereal. Plenty of substitutes are available for Kellogg's cereal. Even if the defendant narrowed the relevant product market to psyllium-containing cereal, the consumers could turn to "Benefit" cereal, a competitor of Heartwise, in the event of an injunction. *See* Transcript at II–45 (testimony of William Weintraub); Plaintiff's exhibit 38. Therefore, the Court finds that an injunction would not deprive the public of access to a uniquely healthy product, namely Heartwise cereal.

In short, the public interest neither weighs for nor against a preliminary in-

---

101. *See supra* note 99.

102. This argument could not find support from a showing of likely success on the dilution claim

because dilution is not predicated upon consumer confusion.

junction. The injunction would not serve to check consumer confusion, because the Court found no consumer confusion which the injunction could curtail. The injunction would restrain trade, but that is the nature of a trademark action and a restraint would be justified if the plaintiff showed a likelihood of success on the merits; thus, the Court does not count this factor against injunctive relief. Finally, an injunction would not harm the public interest by depriving consumers of a particularly healthy product, given plenty of substitutes, including another psyllium-based cereal.

## VII. CONCLUSION

Four factors are relevant to the determination of whether preliminary injunctive relief is warranted: likelihood of success on the merits, irreparable injury to the plaintiff, harm to others, and the public interest. The Court found that the plaintiff has not shown a likelihood of success on the merits and, in fact, failed to raise serious questions going to the merits of the suit. Also, the plaintiff failed to show irreparable injury it is now suffering or would suffer in case the Court denied relief. Moreover, the defendant showed that an injunction would harm it; the balance equities tips decidedly in Kellogg's favor. Finally, the Court finds that injunctive relief does not implicate the public interest. Given that the plaintiff has failed to show that any of the factors favor injunctive relief, the Court finds no justification for a preliminary injunction.

WHEREUPON, upon consideration and being duly advised, the Court finds the plaintiff's motion for a preliminary injunction to be meritless, and it is, therefore, DENIED.

IT IS SO ORDERED.

Appendix A

# Kellogg's

# Heartwise™

## High soluble fiber, natural bran cereal.

### Provides 12 essential vitamins and minerals.

K

## Crunchy Flakes

NATURE'S HIGHEST
WITH PSYLLIUM
SOLUBLE FIBER GRAIN

*new*

High
soluble fiber cereal

DEFENDANT'S
EXHIBIT
X 1

NET WT. 10.3 OZ.